# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
## (HEARD AT MEMPHIS)

**FOR PUBLICATION**

**Filed:**   February 1, 1999

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| APPELLEE, | ) | SHELBY CRIMINAL |
| | ) | |
| v. | ) | Hon. Jon Kerry Blackwood |
| | ) | |
| PRESTON CARTER, | ) | No. 02S01-9705-CR-00045 |
| | ) | |
| APPELLANT. | ) | |

FOR APPELLANT:

Glenn I. Wright
Memphis

Thomas F. Bloom
Nashville

FOR AMICUS CURIAE TENNESSEE
ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS:

W. Mark Ward
Memphis

FOR APPELLEE:

John Knox Walkup
Attorney General and Reporter

Michael E. Moore
Solicitor General

Amy L. Tarkington
Assistant Attorney General
Nashville

# O P I N I O N

AFFIRMED IN PART;
REVERSED IN PART AND REMANDED                    HOLDER, J.

**OPINION**

In this capital case, the defendant, Preston Carter, pled guilty and was convicted on two counts of felony murder. A jury sentenced him to death on both counts, finding that the murders of Thomas and Tensia Jackson were especially heinous, atrocious, and cruel. Tenn. Code Ann. § 39-2-203(i)(5). The jury imposed sentences of death based upon the presence of this sole aggravating circumstance.

On direct appeal to the Tennessee Court of Criminal Appeals, the defendant raised numerous issues. The appellate court affirmed both his convictions and sentences. The defendant has appealed to this Court. On December 29, 1997, we entered an order limiting oral argument to seven issues and set oral argument at the May term of Court in Memphis.[1] See Tenn. S. Ct. R. 12.[2]

We have thoroughly reviewed the issues addressed by the parties' briefs and carefully examined the law, the record, and the opinion of the Court of Criminal Appeals. We have found that the defendant's contentions as to the validity of the indictments are devoid of merit. We, therefore, affirm the convictions of first degree felony murder.

The defendant has raised several issues involving his sentencing trial. Among the errors was a challenge to the trial judge's use of outdated verdict

---

[1]Oral argument was heard in this case on May 12, 1998, in Memphis, Shelby County, County, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

[2]Tennessee Supreme Court Rule 12 provides in pertinent part as follows: "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument."

2

forms.  Because we find the use of the outdated verdict forms to be such fundamental error, we must reverse the defendant's sentences and remand for a new sentencing hearing.  We shall address alleged errors in the sentencing phase which may be relevant on remand.

## FACTUAL BACKGROUND

The defendant pled guilty to two counts of first degree felony murder.  The scant record before us, therefore, consists only of testimony and evidence presented during the sentencing phase of the defendant's trial.

The defendant, Preston Carter, along with two other men, Curly D. Ivery and Lewis Anderson, went to a Memphis apartment complex during the early morning hours of May 28, 1993, intending to rob a drug dealer.  The defendant and Anderson, however, went to the wrong apartment and knocked on the door of the apartment where Thomas and Tensia Jackson resided with their three-year-old daughter.  Co-defendant Ivery waited in the car.

Mr. Jackson went to the door but did not open it.  The defendant and co-defendant Anderson asked Mr. Jackson "if he [had] anything."  Mr. Jackson, refusing to open the door, asked Anderson what he was talking about.  The defendant realized they had gone to the wrong apartment and began to back away when Anderson said, "Preston, fuck it, if he ain't got no drugs, he must have money."

The defendant handed his sawed-off shotgun to Anderson and kicked in the apartment door.  Apparently, Mrs. Jackson hid in the bathroom.  At gunpoint, the men ordered Mr. Jackson to instruct his wife to exit the bathroom.  The men

3

then forced Mr. Jackson to lie on the floor. The defendants demanded money. When Mrs. Jackson exited the bathroom, Anderson attacked and raped her. The defendant retrieved his sawed-off shotgun from the bed and continued searching for anything of value. The record is unclear as to where the Jacksons' three-year-old daughter, Tierney, was during this time.

The defendant's account of the story was that, while he was bent over searching under the couch, Mr. Jackson came at him with a butcher knife. The defendant then turned and pointed the shotgun at Mr. Jackson. The defendant claimed Mr. Jackson then ran into a closet in his daughter's bedroom.

The defendant shot Mr. Jackson at close range while Mr. Jackson sat huddled in his daughter's bedroom closet. The shotgun pellets entered the right side of his forehead and moved through his skull to the back left side of his head. The multiple pellets shattered the skull and exploded the brain. The explosive effect of the shotgun tore open the right side of his head. As a result, the medical examiner had to reconstruct the skull in order to determine the location of the entrance wound. After shooting Mr. Jackson, the defendant returned to the master bedroom and found Mrs. Jackson in the bathroom. Anderson was getting dressed.

Mrs. Jackson asked about her husband, and Anderson responded by demanding money. Mrs. Jackson began to scream, and Anderson threw a jewelry box at her. The defendant's account of the last moments of Mrs. Jackson's life was as follows: "She had backed up all the way in there and before I shot her she was begging and pleading me, 'Please don't shoot me, I'll do anything, please don't shoot.'"

4

The defendant shot Mrs. Jackson at close range in the head. The shotgun pellets entered near her left eye and moved to the back of the head. The county medical examiner said Tensia Jackson tried to shield her face with her hands. The shotgun pellets created an opening measuring three inches by six inches and exploded her brain. No drugs or alcohol were found in either of the victims' bodies.

The bodies were discovered about 3:45 a.m. after Kenny Jackson, Mr. Jackson's brother, stopped at the apartment to take Mr. Jackson to the bakery where they worked. The apartment had been ransacked; drawers were pulled from dressers and their contents strewn; the Jacksons' bed was torn apart. When Kenny Jackson found the apartment ransacked, he notified Mrs. Jackson's brother, Derrick Lot. Mr. Lot searched the apartment and looked into a closet where he found three-year-old Tierney. Tierney's white nightgown was splattered with blood. Tierney was lying next to her father. She was unharmed. Mr. Lot told jurors, "[There] was blood all over the wall. There was blood on the floor, blood on her, blood -- it was blood everywhere." When Tierney saw her uncle, she raised her head up and began to cry.

The defendant pled guilty to two counts of felony murder committed in the perpetration of aggravated burglary. A sentencing hearing was held to determine whether he would receive life in prison or death.

The defendant testified at the hearing. He stated that, at the time of the shooting, he was under the influence of alcohol and not in his "right state of mind." He testified he was sorry for what happened but blamed Anderson for setting the whole series of events in motion.

5

The defendant acknowledged his previous convictions of burglary in 1991 and theft in 1993. In March 1993, he was charged with aggravated robbery and convicted in September 1994. The defendant was on probation when he killed the victims. He admitted to drinking alcohol, smoking marijuana, using cocaine, and using weapons, all in violation of his probation.

## SUFFICIENCY OF THE INDICTMENT

The defendant challenges the sufficiency of the felony murder indictments for failing to allege the appropriate mental state of recklessness. The State argues the defendant has waived this issue by virtue of pleading guilty to the charges. In the alternative, the State asserts that the indictment correctly charges the offenses.

By his guilty pleas, the defendant admitted to every essential element of the offense pleaded in the indictment. Nonetheless, on appeal the defendant can challenge the jurisdiction of the court to render judgment, raising the issue of the sufficiency of the indictment. Tennessee Rule of Criminal Procedure 12(b)(2) states that waiver provisions do not apply to defects indicating a court lacked jurisdiction or the indictment failed to state an offense. Those defects may be "noticed by the court at any time during the pendency of the proceedings." Tenn. R. Crim. P. 12(b)(2). Pursuant to Tennessee Rule of Appellate Procedure 13(b), "[t]he appellate court shall also consider whether the trial and appellate court have jurisdiction over the subject matter, whether or not presented for review." Furthermore, a no contest plea or plea of guilty does not waive a challenge to the court's jurisdiction. See United States v. Heller, 579 F.2d 990, 998 (6th Cir. 1978).

6

Thus, this issue was not waived by the failure to object before the guilty pleas or the failure to raise the issue.

We now turn to the specific challenges to the indictments which read:

> Preston Carter . . . during the period of time between May 27, 1993 and May 29, 1993, in Shelby County, Tennessee, and before the finding of this indictment, . . . did <u>unlawfully</u> kill [Tensia and Thomas Jackson] during the perpetration of Aggravated Robbery, in violation of T.C.A. 39-13-202 against the peace and dignity of the State of Tennessee.

(Emphasis added). At the time of the offenses, felony murder was defined as "a <u>reckless</u> killing of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2) (1991) (emphasis added).[3] The defendant contends that the indictments do not allege all essential elements of the offense because the indictments fail to include the mens rea of recklessness. The defendant, therefore, argues that the court was without jurisdiction.

In <u>State v. Hill</u>, this Court held:

> that for offenses which neither expressly require nor plainly dispense with the requirement for a culpable mental state, an indictment which fails to allege such mental state will be sufficient to support prosecution and conviction for that offense so long as
>
> > (1)    the language of the indictment is sufficient to meet the constitutional requirements of notice to the accused of the charge against which the accused must defend, adequate basis for entry of a proper judgment, and protection from double jeopardy;
> >
> > (2)    the form of the indictments meets the requirements of Tenn. Code Ann. § 40-13-202; and

---

[3]In 1995 the legislature amended the statute to omit the word "reckless."

7

(3)    the mental state can be logically inferred from the conduct alleged.

Hill, 954 S.W.2d 725, 726-27 (Tenn. 1997). Alleging the mental state was a requirement of every indictment at common law. Id. at 729. In Hill, we noted that it is necessary to charge the mens rea if the statutory definition of the offense includes a mens rea. Id. This Court has relaxed the strict pleading requirements of common law as noted in State v. Ruff, 978 S.W.2d 95, 100 (Tenn. 1998), by holding that an indictment which includes a reference to the criminal statute that sets forth the mens rea is sufficient to give a defendant notice of the applicable mental state. "Thus, where the constitutional and statutory requirements outlined in Hill are met, an indictment that cites the pertinent statute and uses its language will be sufficient to support a conviction." Id. at 100.

In this case, both felony murder indictments referenced the appropriate statute. This reference provided notice to the defendant of the applicable mens rea, notice of the offense upon which to enter the judgment, and protection from subsequent prosecution on the same offense. Id. at 99; Hill, 954 S.W.2d at 726-27. The indictment also meets the requirements of Tenn. Code Ann. § 40-13-202. See State v. Marshall, 870 S.W.2d 532, 539 (Tenn. Crim. App. 1993); see also Hagner v. United States, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861 (1932). The language of the felony murder counts was legally sufficient under Ruff.

8

**DEFENDANT'S STATEMENT**

The defendant next contends the trial court erred in refusing to suppress his statements to authorities. He claims that he could not have voluntarily waived his constitutional rights because he was under the influence of alcohol and drugs; thus, his statement was involuntary.

The Court of Criminal Appeals deemed this issue waived because the defendant pled guilty and failed to preserve the issue for appellate review by certifying the question under Tenn. R. App. 3(b) and Tenn. R. Crim. P. 37(b)(2)(iv).

In capital cases, this Court has considered challenges to statements made by defendants even though the defendants pled guilty. The Court has not required a defendant to preserve or certify the suppression issue before reviewing it. In State v. Nichols, 877 S.W.2d 722, 732 (Tenn. 1994), this Court considered a challenge to a trial court's suppression ruling in a situation in which the defendant pled guilty. See also State v. Keen, 926 S.W.2d 727, 741 (Tenn. 1994) (considering suppression issue after defendant pled guilty to first degree felony murder). In State v. Bates, 804 S.W.2d 868, 871 (Tenn. 1990), this Court considered a challenge to a trial court's ruling on suppression. We noted that the defendant did not waive his objection to the trial court's order.

Addressing the merits of the defendant's claim, the defendant argues that his confession was involuntary because he was under the influence of alcohol and drugs. Unless the evidence preponderates against a trial court's findings, a trial court's determination that a confession was given knowingly and voluntarily will be binding. State v. Henning, 975 S.W.2d 290 (Tenn. 1998); State v. Odom,

9

928 S.W.2d 18, 23 (Tenn. 1996); Keen, 926 S.W.2d at 741; Nichols, 877 S.W.2d at 732; State v. O'Guinn, 709 S.W.2d 561, 566 (Tenn. 1986). Ample evidence exists to support the finding that the confession was voluntary and thus admissible.

At the suppression hearing, the defendant admitted he (1) was given the Miranda warning three times and (2) understood the nature of the rights read to him because he had been arrested before. Although he claimed to have consumed a fifth of gin, fifteen twelve-ounce beers, and three marijuana cigarettes laced with cocaine between the shooting and the questioning by police, Sgt. Michael Houston described the defendant as normal and cooperative. The defendant was described as "pretty truthful" when answering questions about the shooting. The defendant gave officers consent to search his house and even initialed an identification tag placed on the murder weapon after it was found in his apartment. Another officer corroborated the description of the defendant. Once at the police station, where the defendant was Mirandized again, he gave a statement, reviewed the written answers, initialed each page, and signed the statement.

On cross-examination, the defendant admitted the statements were not the result of coercion or threats. His statements, he acknowledged, were given freely and voluntarily. The record supports the trial court's finding that the confession was voluntary and thus admissible.

**AGGRAVATING CIRCUMSTANCE (i)(5)**

The defendant argues that Tenn. Code Ann. § 39-13-204(i)(5) was not an appropriate basis for sentencing him to death. His argument is premised on the

following: (1) that the trial court erred by failing to instruct the jury that the defendant must have intended to torture the victims; and (2) the evidence is insufficient to support the application of (i)(5). We disagree.

## Jury instruction

The defendant argues that (i)(5) required the jury to find that the defendant had the specific intent to torture the victim. The defendant acknowledges that the jury was instructed on the definition of "torture" pursuant to State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985). Circumstance (i)(5) does not require a mens rea. The aspect of torture focuses on the circumstances of the killing. State v. Blanton, 975 S.W.2d 269 (Tenn. 1998). The (i)(5) circumstance states: "The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." The torture prong of (i)(5) only requires a jury finding that the victim remained conscious and sustained severe physical or mental pain and suffering between the infliction of the wounds and the time of death. Whether the defendant intended the victim's suffering is irrelevant under (i)(5). Blanton, 975 S.W.2d at 281. This issue is without merit.

## Sufficiency of evidence

The defendant argues that the evidence does not support the "heinous, atrocious, or cruel" aggravating circumstance for both murders. We find the proof is sufficient to support the jury's finding of mental torture beyond a reasonable doubt.

11

Jurors evaluated the proof and determined the victims suffered severe mental pain. As to both killings, the jury wrote on the verdict forms: "heinous," "atrocious," "cruel," and "torture."

"Torture" is defined as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." Williams, 690 S.W.2d at 529. Both Mr. and Mrs. Jackson were shot once and died instantaneously. Therefore, the issue facing the Court is whether the evidence supports a finding that the victims suffered mental torture. After reviewing the evidence in the light most favorable to the State, this Court must determine whether a rational trier of fact could have found the existence of the aggravating circumstance of mental torture beyond a reasonable doubt. State v. Nesbit, 978 S.W.2d 872 (Tenn. 1998).

The anticipation of physical harm to oneself is torturous. Nesbit, 978 S.W.2d at 886-87; State v. Hodges, 944 S.W.2d 346, 358 (Tenn. 1997), cert. denied, ___U.S. ___, 118 S.Ct. 567, 139 L.Ed.2d 407 (1997). This mental torment is intensified when a victim either watches or hears a spouse, parent, or child being harmed or killed, or anticipates the harm or killing of that close relative and is helpless to assist. See State v. Soto-Fong, 928 P.2d 610 (Ariz. 1996), cert. denied, ___ U.S. ___, 117 S.Ct. 1826, 137 L.Ed.2d 1033 (1997) (killing is especially cruel when a victim suffers mental anguish by watching or hearing the defendant kill another or while waiting his own fate while parent or spouse is killed); see also State v. Gillies, 662 P.2d 1007, 1020 (Ariz. 1983) (uncertainty as to ultimate fate relevant to establish cruelty); Dampier v. State, 268 S.E.2d 349 (Ga. 1980); Hawkins v. State, 891 P.2d 586 (Okla. Crim. App. 1994) (mental suffering includes uncertainty over one's ultimate fate).

12

The evidence demonstrates that the defendant armed himself with a sawed-off shotgun and went to the Jacksons' apartment in the middle of the night. He kicked in the apartment door and, along with Anderson, demanded money and drugs. They continued to make the demands even though the couple repeatedly said they did not know what the two men were talking about. Although the defendant quickly realized he and Anderson had the wrong apartment, he pursued the senseless attack on the unsuspecting family.

Mr. Jackson certainly endured mental torture. He was forced to lure his wife out of the safety of the bathroom. He knew the men were violent because the defendant was armed with a shotgun and had kicked in his door. After luring his wife out of the bathroom, she was raped. Although Mr. Jackson was not in the bedroom when the attack on his wife occurred, he surely knew or at least strongly suspected that his wife was being injured or raped because Anderson repeatedly told the defendant to close the bedroom door. Mr. Jackson, who was held at gunpoint, was helpless to assist his wife.

The jury could have reasonably inferred that the child was placed in the closet or entered the closet prior to the shooting of her father because the child's uncle found her beside her dead father. The jury could even infer that her father tried to protect her in the closet. Her nightgown was covered with blood. Thus, a jury could find that she was there when the defendant placed the shotgun to Mr. Jackson's head and pulled the trigger.

Mr. Jackson inevitably feared for his daughter's safety during the time the two were in the closet before he was shot. Mr. Jackson feared for the safety of his wife whom he knew was with one of the attackers in another room. Mr.

13

Jackson's anguish over the safety of his family was compounded by fear of what fate he might suffer.

Mrs. Jackson certainly endured mental torture. While she was being raped in the bedroom, she surely wondered what was happening to her husband and daughter in the other part of the apartment. While she was being attacked, Mrs. Jackson would certainly have heard the shotgun blast and wondered if her husband and daughter were both still alive. She would also realize that her own life was at risk because the robbery had escalated into a murderous attack. When the defendant entered the bedroom, she asked what had happened to her husband. She screamed when the men responded only by demanding money. Anderson threw a jewelry box at Mrs. Jackson, and the defendant backed Mrs. Jackson into the small bathroom. As she tried to shield herself with her hands, she certainly thought about her fate and the fate of her husband and daughter. The defendant admitted that in the last moments of her life she begged and pleaded with him not to shoot. She offered to "do anything." The defendant shot Mrs. Jackson at close range.

We find the proof is sufficient to support the jury's finding of mental torture beyond a reasonable doubt.

## VALIDITY OF VERDICT FORM

The defendant committed his offenses in 1993 and was sentenced in 1995. The trial judge, however, submitted to the jury outdated verdict forms that were used before the sentencing laws changed in 1989. The pre-1989 forms permitted sentences of death to be imposed on a lower burden of proof than that required by the 1989 amendment. The defendant argues that submission of the

14

improper forms denied him his fundamental right to be sentenced to death based upon the appropriate burden of proof.

The State advances two alternatives in rebuttal to the defendant's assertions. First, the State urges this Court to find that the error is waived because defense counsel failed to raise an objection when the pre-1989 verdict forms were submitted to the jury. Alternatively, the State argues that the trial judge verbally instructed the jury as to the proper standard and that the jury is presumed to have followed those instructions.

We find the State's waiver position to be devoid of merit. Pursuant to State v. Stephenson, 878 S.W.2d 530, 553-54 (Tenn. 1994), we hold that the submission of outdated verdict forms in this case substantially affected the defendant's fundamental right to be sentenced to death based on the proper standard of proof. See also Camago v. State, 940 S.W.2d 464, 469 (Ark. 1997) (holding submission of a verdict form containing improper sentencing standard not waived because the error concerned a matter "essential to the jury's imposition of the death penalty itself" and the error was not cured by subsequent juror polling). An error that affects a substantial right of a defendant may be raised at any time where necessary to do substantial justice. Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(b); Stephenson, 878 S.W.2d at 553-54. Accordingly, we shall address the merits of the defendant's claim.

Prior to 1989, a defendant could be sentenced to death provided the jury found no mitigating circumstances sufficiently substantial to outweigh the statutory aggravating circumstances. Tenn. Code Ann. § 39-2-203(g) (This section was transferred to Tenn. Code Ann. § 39-13-204 in 1990). Following the Sentencing Reform Act of 1989, however, the legislature codified a higher

15

burden of proof for sentencing in capital cases. The post-1989 burden of proof mandates that any aggravating circumstances not only be proven beyond a reasonable doubt but that the aggravating circumstances must also outweigh any mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-2-204(g).

The jury was properly instructed as to the post-1989 standard. While the jury was presumed to follow the trial judge's instructions, the jury deliberated with and signed the pre-1989 sentencing verdict forms which stated in pertinent part:

> We, the Jury, unanimously find that there are no mitigating circumstances sufficiently substantial to outweigh the statutory aggravating circumstances so listed above.

Following the jury's deliberations with these forms, the judge read from the incorrect verdict forms when sentencing the defendant to death. We hold that the jury's use of and signing of the improper verdict forms rebut the presumption that the jury followed the trial judge's verbal instructions.

Our legislature has mandated that a jury, when sentencing a defendant to death, must "[s]ignify that the state has proven beyond a reasonable doubt that the statutory aggravating circumstance or circumstances outweigh any mitigating circumstances." Tenn. Code Ann. § 39-13-204(g)(2)(A)(ii). A jury must signify this finding by signing a form that substantially complies with the form set forth in our statute. Tenn Code Ann. § 39-13-204 (g)(2)(B). The statutory form states: "We, the jury, unanimously find that the state has proven beyond a reasonable doubt that the statutory aggravating circumstance or circumstances outweigh any mitigating circumstances." Tenn Code Ann. § 39-13-204 (g)(2)(B). By signing

16

the verdict form, jurors signify they have followed the legislative mandate and employed the correct standard.

In State v. Stephenson, this Court reversed a death sentence because: (1) the court gave conflicting instructions as to the burden of proof; and (2) the sentencing verdict form failed to signify the jury used the beyond-a-reasonable-doubt standard. Stephenson, 878 S.W.2d at 557-58. Under the capital sentencing statute, the death penalty may be imposed only upon a unanimous finding that any aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt. Id. at 555. In Stephenson, this Court found the verdict form failed to conform to the legislative mandate.

The jury's signing of the pre-1989 verdict forms in this case signifies that the defendant was sentenced to death under a standard that did not comport with the legislative mandate. Accordingly, the defendant's sentences of death are premised upon verdict forms that are illegal, void, and of no effect.

This Court is charged with ensuring that a sentence of death is not imposed in any arbitrary fashion. Tenn. Code Ann. § 39-13-206(c)(1)(A). As we stated more than 100 years ago:

> If the least departure from the mode or extent of punishment prescribed by the law of the land for the commission of crime is encouraged or tolerated, how great a departure will be allowed? Where is a limit to be found? The laws of the land prescribing the mode and extent of punishment will be practically nullified, and stand as dead letters upon the statute books; and in lieu thereof, the mode and extent of punishment which may be inflicted upon persons convicted of crime will be regulated by, and depend alone upon, the taste, fancy, whim, caprice, partiality or prejudice of the particular court or jury trying the offender, and such taste, fancy, whim, caprice, partiality or prejudice, will be the law of the case.

17

Murphy v. State, 47 Tenn. 516, 523-24 (1870). We cannot find this error harmless as the verdict forms sentencing the defendant to death are void and of no effect.[4] To uphold two death sentences based upon illegal verdicts would countenance a degree of arbitrariness and capriciousness in the defendant's death sentences that is incompatible with our duty. See State v. Coffey, 389 S.E.2d 48, 65 (N.C. 1990) (holding that the signing of a proper verdict containing the proper sentencing standard was mandatory to support a sentence of death). We cannot condone error of such a prejudicial nature. Accordingly, the defendant's sentences of death are reversed and this case is remanded for resentencing to be conducted in a manner consistent with this opinion.

## CONCLUSION

As to the verdict forms employed in this case, we have determined that the completed forms which omitted the beyond-a-reasonable-doubt standard did not comply with the law. The results are facially void verdicts based upon a lower standard of proof resulting in prejudicial error affecting the verdicts. The sentences of death are reversed, and the case is remanded for resentencing. All aspects of the new sentencing hearing should be conducted in conformity with this opinion.

Because of the remand for resentencing, we will not address the defendant's challenge to the removal of a potential juror. We also pretermit statutory review of the proportionality of the death sentence imposed against the defendant as otherwise required by Tenn. Code Ann. § 39-13-206(c)(1)(D).

---

[4]This holding does not preclude a harmless error analysis in all cases involving verdict form errors. A harmless error analysis in this case simply cannot be employed as, for the reasons set forth above, the verdict forms are void and cannot operate to sentence the defendant to death.

18

The costs of this appeal are taxed to the State.

_____
JANICE M. HOLDER, JUSTICE

**Concurring:**

Anderson, C.J.
Drowota, Birch, and Barker, J.J.

19