IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 2, 2004

**STATE OF TENNESSEE v. CARLOS EDDINGS**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 01-03777    W. Otis Higgs, Jr., Judge**

_____

**No. W2003-02255-CCA-R3-CD  - Filed October 8, 2004**
_____

The Defendant, Carlos Eddings, was tried and convicted for aggravated robbery, and the trial court sentenced the Defendant to ten years in prison. The Defendant appeals contending that: (1) the trial court permitted improper closing argument by the State; and (2) the trial court improperly applied enhancement factors when sentencing the Defendant. In a supplemental pro se letter, the Defendant asks this Court to consider whether the trial court improperly gave the jury an instruction after it began deliberating. After a through review of the record and applicable case law, we conclude that, based on Blakely v. Washington, the sentence must be modified to a term of eight years. Otherwise the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part,**
**Modified in Part, and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES, J., joined. DAVID G. HAYES, J., filed a concurring and dissenting opinion.

Garland Erguden, Memphis, Tennessee, for the appellant, Carlos Eddings.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; William L. Gibbons, District Attorney General; David Zak, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises out of the Defendant's conviction for the aggravated robbery of the victim, Celeste Williamson, on October 23, 2000.

**A.  Facts Presented at Trial**

At the Defendant's trial, the following evidence was presented. Celeste Williamson, the victim, testified that she has been employed with Direct Insurance since March of 1997, and worked at the office located in Shelby County. She said that, on October 23, 2000, she opened the office at approximately ten minutes before 9 a.m. Williamson testified that, after she went into the office and turned off the alarm system, she went to her desk and began doing paperwork. She said that at 9:05 a.m. two black men, one tall with a mask on and an automatic weapon and the other without a mask and with a roll of duct tape, came in the front door of the office. The men came toward her and started yelling "b****, hurry up. We're here to rob you and we've only got two minutes so hurry up." Williamson identified the Defendant as the man who entered her office with the roll of duct tape.

Williamson testified that the Defendant got behind her and was choking her as he wrapped her mouth, face, and nose with duct tape. She said that the men dragged her to the safe and then ordered her to open the safe. The men were on either side of her while she was on her knees opening the safe. She said that the man with the mask held the gun to her while she was trying to get the keys in the safe in order to get it open. She said that she was nervous and could not breathe. Williamson testified that she finally got the safe open and gave the men the two bags inside, which contained approximately $1700.00 in cash, money orders, and checks. She testified that the man with the gun wiped his fingerprints off of the safe after he touched the safe.

Williamson said that, after she gave the men the money, the man with the mask told her to get down on the floor, and then he put the gun to her head and told her not to tell anyone and not to call the police. She said that the Defendant then retrieved her billfold containing her credit cards, driver's license, and $295.00, and told her not to tell anyone because they had her personal information and would kill her if she did. Williamson said that she was scared for her life and, as a result, she suffered a heart attack. Williamson explained that, after the men left, she got up off the floor and was having chest pains, her head was hurting, and she was getting nauseated. She said that she ran out the front room door and to a "cash place" located a "couple of doors down" from her office. She testified that the employees at the "cash place" called 911, and the operator told her not to remove the duct tape. Williamson said that, when the police came, she explained to them what had happened and provided them with a description of the intruders, before being taken by ambulance to the hospital. She said that she told the police that, during the robbery, she noticed a scar that looked like a zipper on the wrist of the unmasked intruder.

Williamson said that, at the hospital, she was diagnosed as having suffered a heart attack. As a result, Williamson was in the hospital for four days and was then sent home. She testified that the police came to her home to show her an array of six photographs from which she identified the picture of the Defendant as the unmasked intruder.

On cross-examination, Williamson testified that she did not notice whether the unmasked intruder had a tattoo of the name "Carlos" on his arm. She said that, on November 3, 2000, she identified the Defendant's picture from a photo array of six photographs, and then she was shown photographs of the scar on the Defendant's wrist. Further, she said that, on November 21, 2000, she

gave the police a statement regarding the incident, which she signed. Williamson testified that she could not remember on which of the Defendant's wrists the scar was located.

Sherry Brooks testified that, in October of 2000, she was employed by National Check Cashing, which is located near Direct Insurance. She said that, a few minutes before 9 a.m. on the morning of October 23, 2000, she saw two men walk past the building. She said that she noticed the men because she wondered if they were going to come into her store. She described both men as "tall and slim," and explained that the taller of the two men had "big lips." Brooks testified that, a few minutes later, Williamson came running in the door "taped up" and crying. She explained that Williamson could not talk because she had tape covering her mouth. Brooks and her co-workers let Williamson in and then locked the door behind her. Brooks said that she asked Williamson if she had been robbed, and Williamson responded affirmatively. Brooks testified that she called the police and they came to her office and took a report. On cross-examination, Brooks said that the Defendant was not the same size, in his weight, as either of the men she saw on the day of the robbery.

Sergeant Kelly, an officer with the Memphis Police Department, testified that she collected evidence, including duct tape from the crime scene, and took pictures of the crime scene. She said that she turned this evidence and other fingerprint cards that she collected over to "processing" and had not yet heard the results.

Sergeant Ben Pruitt, and officer with the Memphis Police Department, testified that he investigated the robbery at Direct Insurance on October 23, 2000. He stated that, later in the day after the robbery occurred, the police received information that Williamson's credit card had been used at a gas station. The sergeant testified that he went to the gas station and interviewed several people who remembered the men that used the credit card. He explained that the gas station employees identified and recognized the car the men using the credit card were in and "knew vaguely where the car belonged and who owned it." Sergeant Pruitt said that, based upon this information, he obtained and executed a search warrant and, in the car, he found a "knit cap[] that had a hole cut through it . . . some gloves and jacket and clothes."

The sergeant said that he was present when they showed Williamson a photo array of six men and asked her if she recognized any of the men as the perpetrator of the robbery. He said that, at the time, he explained to Williamson that these men may or may not have anything to do with the crime and not to pick anyone out unless she was certain that who she was picking was the man who committed the crime.

The sergeant stated that he was present when the Defendant was arrested on November 2, 2000, and when the Defendant confessed to the crime. He said that he checked on the Defendant approximately every fifteen minutes before he gave the Defendant, and the Defendant signed, a waiver of his Miranda rights. The sergeant said that, later, the Defendant orally confessed to the crime, and then he signed a written confession. The sergeant recounted that, in the Defendant's confession, he said that he and another man randomly ended up at Direct Insurance and decided to rob it. He told the officer that he took duct tape and taped the victim and that the other individual

was armed with a gun. The officer said that the Defendant told him that the two men obtained approximately $2000 from the robbery and the Defendant's share was $500. Sergeant Pruitt stated that he and another officer took photographs of the Defendant's arm, which had a large scar.

On cross-examination the officer testified that the search warrant that he executed was to search for "Maurice Eddings" and described him as having a scar. The officer also testified that the Defendant was six feet two inches and weighed approximately 235 pounds, which does not match the description in the search warrant. The officer said that, on the day after the Defendant was arrested, he brought the Defendant up to his office to speak with the Defendant early in the day, and handcuffed the Defendant to a bench. He said the Defendant did not sign the waiver of rights form until 12:54 p.m. that afternoon, and did not sign his confession until 5:30 p.m. The officer conceded that some people lie when giving a statement to police. The officer also stated that the employees at the gas station provided the name and description of Maurice Eddings and not Carlos Eddings. Sergeant Pruitt stated that none of the items found during the search that were suspect, i.e., pantyhose, masks, and a BB gun, were found in the Defendant's possession.

James Dalton testified that he was employed with the Tutwell Oil Company and that, on November 1, 2000, police officers came into his gas station and asked him questions about a patron who had used a stolen credit card. Dalton testified that he reviewed with police surveillance camera recordings to look at the date and time that the stolen credit card was used in his store and, from that, the police officers developed and showed him a photo array and asked him to pick out the man using the stolen credit card. Dalton stated that the man that used the stolen credit card was a regular customer, who usually paid in cash. Dalton testified that the man was not the Defendant and the Defendant was not with the man using the card.

Dennis McNeil, an officer with the Memphis Police Department, testified that he was involved in the robbery investigation in this case. He said that he interviewed the Defendant with Sergeant Craig and that no one promised the Defendant anything or promised the Defendant that he could leave if he confessed to the crime. On cross-examination, the officer stated that he had no idea what was said to the Defendant prior to interviewing him. The officer said that Sergeant Pruitt, who is Caucasian, asked he and Lieutenant Craig, who are both African-American, to speak with the Defendant because the Defendant did not want to "talk to a white officer."

Lieutenant Anthony F. Craig, an officer with the Memphis Police Department, testified that he interviewed the Defendant. He said that he spoke with the Defendant about general information and not about the details of the case itself. He explained that he did not make any promises to the Defendant. On cross-examination, Lieutenant Craig stated that the Defendant did not confess to him.

Sergeant Matthew S. Pugh, an officer with the Memphis Police Department, testified that he worked on this investigation, and, during his investigation, he learned that some of the victim's personal items, including credit cards, had been taken. Accordingly, he checked with the bank to see if any of those items had been used, and he learned that one of the credit cards was used at a gas station. The officer said that, from gas station's surveillance tapes, a gas station attendant recognized

a car from the neighborhood whose occupants used the credit card. The attendant told the officer where the car was usually parked in the neighborhood. The officer said that he found the car and discovered that it was registered to Maurice Eddings. He said that he got a photograph of Maurice Eddings and made a photo array, from which the gas station attendant identified Maurice Eddings as the driver of the car and the man that used the credit card. The officer said that, based upon this information, he obtained a search warrant naming Maurice Eddings and an unknown male with a six-inch long scar on his arm.

Officer Pugh testified that, when he executed the search warrant, Maurice Eddings' mother told one of the officers that she had another son named Carlos Eddings and that he had a six-inch scar on one of his arms. She then provided an address where Carlos Eddings could be found. The officer said that they found Carlos Eddings, the Defendant, at the address provided and took him into police custody. Officer Pugh stated that, thereafter, he brought a photo array, which included the Defendant's photograph, to Williamson's home, and she identified the Defendant as one of the robbers. He said that Williamson also positively identified pictures of the scar on the Defendant's arm as the same as the scar that she noticed on the robber.

The officer said that, after Williamson's identification, he went back to the police station to interview the Defendant. He said that he advised the Defendant of his rights and tried to "build a rapport" with him. The officer said that he told the Defendant that the victim had identified him and had identified the scar on his arm. Officer Pugh said that the Defendant wanted to confess, and the officer took his statement. The officer said that the Defendant described the crime to him from the time that the Defendant and the Defendant's brother-in-law entered Direct Insurance Company until the time that they left. The Defendant told him that his brother-in-law planned the robbery and was armed with a semi-automatic handgun during the robbery. The Defendant said that his brother-in-law told him to duct tape the victim and to look for money inside the business. He told the officer how he and his brother-in-law split the money after the robbery. The officer read the Defendant's statement, stating:

> Question: Did you participate in the robbery of Direct Insurance Company located at 3388 North Watkins, which occurred on October 23, 2000, at approximately 9 a.m.? Answer: Yes, sir. Question: Who was with you during the robbery? Answer: . . . My brother-in-law. Question: Were you armed with a weapon? Answer: No, I was not. No, sir. Question: Was [your brother-in-law] armed with a weapon? Answer: Yes, sir. Question: Were you wearing a mask? Answer: No, sir. . . . Question: Was [your brother-in-law] wearing a mask? Answer: Yes, sir. Question: Who planned the robbery? Answer: It just happened, a really bad mistake of mine. Question: Why Direct Insurance company? Answer: It really was not just an exact reason why Direct Insurance. Question: Did you know that Direct Insurance kept a lot of money inside? Answer: Just I did not know that, no, sir. Question: Did you or [your brother-in-law] know any employees that worked inside? Answer: No, sir. Question: To your knowledge, does [your brother-in-law] or any of your family have insurance with Direct? Answer: No, sir, not to my knowledge.

The officer testified that, through his investigation, he learned that Maurice Eddings had a business relationship with Direct Insurance. The officer continued reading the Defendant's statement, stating:

> Question: Explain to me in your own words the events leading up to the robbery and during the robbery. Answer: I spent the night over there that night with [my brother-in-law] . . . . We walked – parked the car, like, by the check cashing place basically on the corner. I walked in . . . first, and [my brother-in-law] came in behind me. I told the lady to be quiet and don't say anything and I attempted to put gray tape on her mouth. The tape didn't stick, and I attempted to wrap the tape around her and she . . . got the keys and opened the safe. [My brother-in-law] took the money out of the safe and we left. Question: Did you or [your brother-in-law] take the lady's pocketbook? Answer: [My brother-in-law] took it. Question: What kind of vehicle were you and [your brother-in-law] occupying? Answer: A gray Cavalier, his mother's car. Question: What was in the safe? Answer: [My brother-in-law] grabbed the little pouch thing and he got the lady's wallet. Question: How much money did you see after the robbery? Answer: It was like close to $2,000. Question: Did you see any checks in the pouch? Answer: Yes. I saw the checks and we threw them away. I think [my brother-in-law] threw them in the trash at home. Question: Did you see [your brother-in-law] with the lady's pocketbook? Answer: Yes, sir.
>
> . . . Question: What happened to the contents of the pocketbook? Answer: We had that. I don't know exactly what he did with it – he had that . . . . Question: Where did you go after the robbery? Answer: To [my brother-in-law's] house . . . . Question: . . . What did you get as a result of this robbery? Answer: A little over $500. Question: Was there anyone else at the house when you and [your brother-in-law] split the money up? Answer: No, sir. Question: Did [your brother-in-law] give any of the contents to Maurice? Answer: Not to my knowledge. Answer: . . . Did you see Maurice the day of the robbery? Answer: No, sir. Question: What type of weapon did [your brother-in-law] have during the robbery? Answer: It was a handgun. I don't know for sure what kind but you rack it back. It's black. Question: Have you ever seen [your brother-in-law] with a gun before? Answer: No, sir. Question: Have you and [your brother-in-law] ever committed any other robberies? Answer: No, sir. . . . Question: Do you have any of the money left? Answer: No, sir. I spent it all. I can't recall where. Question: Is there anything else you would like to add to this statement? Answer: Yes, sir. I really wasn't trying to hurt anybody. I know that was a big mistake and I am very sorry. If it's possible, I'll get a job and do whatever they say and replace what they say is missing. Honestly, I'm not just a bad person. Never been involved in anything. . . .

The officer then testified that he took a photograph of the Defendant's right arm that showed his scar and another of the Defendant's left arm that showed a tattoo of his name.

On cross-examination, Officer Pugh testified that the incident report, which was made shortly

-6-

after the robbery was reported, indicated that the robbery was perpetrated by three men. The officer also stated that the search warrant that he prepared was for "an unknown male black, approximately 22 years old, medium build, medium complexion, short natural Afro, with a . . . six-inch scar on left arm," and then he conceded that he would not describe the Defendant as having a medium build. Officer Pugh stated that, after issuing the search warrant, he did not find a money bag or any checks in any garbage cans. The officer stated that the Defendant did not complete high school.

The Defendant testified on his own behalf that he was arrested while at his brother-in-law's house and taken to a gas station and then to the police station. The Defendant admitted that he has previously been arrested for theft of property. The Defendant said that, after he was arrested for this crime, he spent the night in jail and, in the morning, he was brought up to speak with police officers. He said that Officer Pugh and another officer spoke with him in the morning and told him that he had been involved in a robbery. The Defendant denied any involvement in the October 23, 2000, robbery of Direct Insurance. He said that he told the police that he had been involved in the robbery because they had been holding him all day and "constantly coming back and forth." He said that the officers told him what was missing from Direct Insurance, how much money had been stolen and provided him other details of the crime. The Defendant said that, at first, he denied involvement in the crime, but later the officers told him that he could go home if he told them about his involvement in the crime. He said that the police officers came in and started yelling and "smacking me around." He said they told him "'look, you are going to make something up right now. Or if you don't, we are going to lock you up for the rest of your life. But if you do, we'll just let you go.'" The Defendant explained that he was able to make the statement that he made from the facts that the police had told him.

The Defendant testified that he has a scar on his arm, but it is on the outside of his forearm and not on the inside as Williamson had testified. The Defendant said that this was the first time that he had ever been arrested and the first time he was ever questioned by police. He said that he had been handcuffed to a bench for eight or nine hours before the police talked to him. The Defendant said that the only reason he gave the statement that he did was because he was trying to get the police to leave him alone and because he believed them when they said that he could go home if he told them that he committed the robbery.

On cross-examination, the Defendant testified that he is about six feet and one inch in height and weighs approximately 280 pounds. He said that he has a scar on his right arm and a tattoo of his name on his left arm, close to his elbow. The Defendant said that his brother Maurice is skinnier than he is and also said that he did not believe that his brother used the victim's credit card. The Defendant denied ever going to Direct Insurance and denied knowing the victim. The Defendant said that he did not listen to the officers as they read him his rights, and he just did what they wanted. He testified that the officers told him that he could pick either his brother or his brother-in-law to be his accomplice in the crime, but that he had to pick one, so he picked his brother-in-law. The Defendant said that the police told him what to say and that, while giving his statement, he repeated to them the information that they gave him. The Defendant denied any knowledge of the robbery until he was arrested and informed about the crime by the police.

Based upon this evidence a jury convicted the Defendant of one count of aggravated robbery.

## B. Sentencing Hearing

At the Defendant's sentencing hearing, the State told the trial court that the Defendant was a Range I, Standard Offender, and then recommended a sentence of ten years due to the serious nature of the crime. Celeste Williamson testified that she was still on leave from work at Direct Insurance. Williamson said that she recommended that the Defendant get a sentence longer than ten years because of the "severity of what he did to me, how long I'm going to be under doctor's care for the rest of my life, and on medication because of this. And the fact that while he was on -- out on bond for what he did to me he committed other offenses." Williamson said that she is on two medications for her heart attack, has to go to physical therapy, and is under a psychiatrist's care and on medication for panic attacks. She has not been able to work since this crime.

The Defendant's pre-sentence report showed that he had two misdemeanor matters that were expunged from his record after he completed diversion and he had been, at the time of the hearing, indicted for aggravated burglary.

The Defendant testified and denied any involvement in this crime. He said that he has no prior convictions, but did have one charge pending against him. On cross-examination, the Defendant admitted that he had one prior conviction for theft of property under $500.

The State argued that the trial court should sentence the Defendant to ten years, two years above the presumptive minimum sentence of eight years, due to the severity of the crime. The trial court held:

> [T]he Defendant in this case is charged with aggravated robbery, an aggravated robbery in which the victim testified that she has been severely physically and mentally injured as a result of the robbery.
>
> I heard testimony at great length from the victim who testified at the trial that she continues to suffer from this incident, psychological problems, under the care of a psychiatrist, all of that. And it's a very serious matter. . . . [I]t was a very serious and a very aggravated robbery.
>
> The interesting thing about this case is that the defendant maintains that he didn't do it. But I remember during the trial the defendant gave a written confession to this trial, to this case. During the trial he says he was coerced, that he was forced to give that statement because they told him that if you want to go home he would have to give a statement.
>
> That he gave a statement under the mistaken thought that he would go home once he confessed. It's an inherent inconsistency quite frankly that a man says "they

said I could go home, but in order to go home I'd have to admit that I committed an aggravated robbery." But that's what he says.

        . . . .

        All those matters will have to be passed on by the Court. Based upon the severity of this case, however, and looking at what the State has presented I believe the State's recommendation of 10 years, as a Range I Standard Offender is a reasonable offer for this kind of case. . . . I'm going to sentence the Defendant to the 10 years as a Range I Standard Offender . . . .

## II. Analysis

The Defendant now appeals contending that: (1) the trial court permitted improper closing argument by the State; and (2) the trial court improperly found that enhancement factors applied when sentencing the Defendant. In a supplemental letter, the Defendant asks this court to consider whether the trial court improperly gave the jury an instruction after it began deliberating.

## A. Closing Argument

The Defendant contends that the State's closing arguments "were so improper that they infected the trial with unfairness and denied due process to the Defendant." The Defendant concedes that the issue is waived because he never objected to any of the statements during the State's closing arguments and he did not raise this as an issue in his motion for new trial, but contends that the prosecutor's actions rise to the level of plain error. The State contends that the Defendant waived this issue and that it does not constitute plain error. We agree with the State.

The Defendant objects to the following statements by the prosecutor:

Does [Williamson] have any reason to lie about anything that happened to her that day? Does she have any reason to lie, to tell 12 to 14 strangers the most horrific experience of her life? Just think about that for one second . . . .

        . . . . Carlos Eddings sat here and did not honor his oath. Does Carlos Eddings have a reason to be less than honest with you? Yes, oh, yes. . . .

        Does the Exxon worker have any reason to lie that [the Defendant] came in that day with the credit card. . . .

        . . . If the officers were going to fill all this in, they'd put him with the gun and the tape and the bad language taking the money out of the safe and out of the purse. Because if they're going to ruin their careers over [the Defendant], better to go big. Better to make it a slam dunk. And if you are going to ruin your career over

[the Defendant] why not have everyone else identify [the Defendant], too? Why just stop here? [The Defendant] is making very real allegations against the police right now. He's saying that the entire Memphis Police Department is lying just to get him. That's a pretty big ego. [The Defendant] thinks a lot of himself. Officers aren't going to do that. They've got thousands of cases. They're going to ruin their careers over [the Defendant]? They could have closed this case out if they wanted to at any time. They could have charged him based on her identification and at one o'clock they would have been done with this. But they went to [the Defendant] who . . the Sergeant said wanted to confess. . . .

It's unfortunate that [the Defendant] is sitting here hoping that there is one or two jurors that's going to buy this. [The Defendant] is trying to make justice racial. It's color-blind. Justice is not about race. But that's what [the Defendant] wants to do. That's was [the Defendant] is trying to do. . . .

It saddens me that his happened. It saddens me that [the Defendant] is making this racial. It saddens me that [the Defendant] did not honor his oath. This system of justice that we have works because of juries. . . .

The Defendant also complains that, after Defense counsel gave his closing statement in which he stated that he had not brought race as an issue and claimed that neither Brooks nor Dalton had a reason to lie when the said that they had not seen the Defendant at the time of the robbery, the prosecution responded:

It must be very liberating to lie to juries because the people that lie to juries, they have a big smile on their face. They sit in this chair. They tell stories. And the defense attorneys do the same.

I suffer through trials. I eat one turkey sandwich a day. I wake up five times a night, and I can't get back to sleep after 4 a.m. Seeking justice and telling the jurors the truth, it takes a toll on me. For defense counsel, it seems to be this big game where we get to hug, we get to laugh. It must be very liberating to lie to juries. . . .

[The Defendant] didn't have that problem because he's not telling the truth. He's got a hope for a juror to buy that used car that he knows will not get off the parking lot. He has nothing to lose by lying to you. If he tells you the truth like he did the officers, you find him guilty. He couldn't take the stand and say I did it because there would be no reason for you to be here. He confessed once and he thought that was enough. He couldn't, he can't, he won't confess again, ever to anything.

The one confession he gave got him charged with Aggravated Robbery and

-10-

nobody else.  The brother-in-law and Maurice didn't get charged with anything.  And [the Defendant] is sitting there thinking I confessed.  And it might be great for my soul but it's not helping me right now.  So now I've got one last chance to get myself out of this mess that I've created by lying, by being less than honest to you. . . .

[Defense counsel] cannot have it both ways.  If you lied concerning this statement for little reason, what are you going to do here, for all the marbles?  If during an exhibition, preseason, whatever, at the beginning of something, if you are going to lie about that, what are you going to do in front of a jury when it all counts?  Although I'm a liar six days a week, when I testify before juries, I tell the truth.  Can't have it.  He told the truth this day and now we're asking you to put him in time out.  And he doesn't want to go there.  So the truth failed him. . . .

The Tennessee Supreme Court "has long recognized that closing arguments are a valuable privilege that should not be unduly restricted."  Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001) (citing State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978)); State v. Goltz,111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).  "Consequently, attorneys are given greater leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments, to be reversed only upon a showing of an abuse of that discretion."  Terry, 46 S.W.3d at 156 (citing Sutton, 562 S.W.2d at 823); see Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975); Goltz, 111 S.W.3d at 5.  This Court has explained that "[closing] arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law."  Goltz, 111 S.W.3d at 5 (citing Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)).

When an appellate court finds an argument to be improper, "the established test for determining whether there is reversible error is whether the conduct was so improper or the argument so inflammatory that it affected the verdict to the Appellant's detriment."  Goltz, 111 S.W.3d at 5 (citing Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758, 759 (1965)).  In measuring the prejudicial impact of an improper argument, this Court should consider the following factors: "(1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case."  Goltz, 111 S.W.3d at 5-6 (citing Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); see State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984).

In Goltz, this Court found that within the closing argument, five general areas of prosecutorial misconduct are recognized:

1.  It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
2.  It is unprofessional conduct for the prosecutor to express his [or her] personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of

the defendant.  See State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); Lackey v. State, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); TENN. CODE OF PROF'L RESPONSIBILITY DR 7-106(c)(4).

3.  The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.  See Cauthern, 967 S.W.2d at 737; State v. Stephenson, 878 S.W.2d 530, 541 (Tenn. 1994).

4.  The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.  See Cauthern, 967 S.W.2d at 737; State v. Keen, 926 S.W.2d 727, 736 (Tenn. 1994).

5.  It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

Goltz, 111 S.W.3d at 6 (quoting STANDARDS RELATING TO THE PROSECUTION FUNCTION AND THE DEFENSE FUNCTION §§ 5.8-5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971)).

We agree with the parties that the Defendant's failure to object to the prosecutor's argument at trial and his failure to raise the issue in his motion for a new trial precludes our review of this issue, subject to our noticing "plain error."  See Tenn. R. App. P. 3(e) (providing that "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in the motion for new trial. . . . ); Tenn. R. App. P. 36(a) (providing that relief is not required for a party who failed to take reasonably available action to prevent or nullify an error); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (stating that failure to object to prosecutor's alleged misconduct in closing argument waives any later complaint).

This Court has, in its discretion, from time to time reviewed allegations of prosecutorial misconduct as "plain error" even in the absence of a contemporaneous objection.  See, e.g., State v. Marshall, 870 S.W.2d 532 (Tenn. Crim. App. 1993), *overruled on other grounds by* State v. Carter, 988 S.W.2d 145 (Tenn.1999) (determining in absence of objection that prosecutor's jury argument was not plain error); State v. Bulter, 795 S.W.2d 680 (Tenn. Crim. App. 1990) (considering whether statements of prosecutor were plain error despite lack of objection by defendant); Anglin v. State, 553 S.W.2d 616 (Tenn. Crim. App. 1977) (determining that in order to justify reversal on the basis of improper argument and remarks of counsel in absence of objection, it must affirmatively appear that the improper conduct affected the verdict to the prejudice of the defendant).

Pursuant to Rule 52(b) of the Tennessee Rules of Criminal Procedure, we have discretion to notice an error that has affected the substantial rights of an accused when necessary to do substantial justice.  State v. Adkisson, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994).  Before an error may be recognized it must be "plain" and must affect a "substantial right of the accused.  The word "plain"

is synonymous with "clear" or equivalently "obvious." United States v. Olano, 507 U.S. 725, 732 (1993). Plain error is not merely error that is conspicuous, but especially egregious error that strikes at the fairness, integrity, or public reputation of judicial proceedings. See State v. Wooden, 683 S.W.2d 553, 559 (Tenn. Crim. App. 1983). When considering whether "plain error" exists we consider the following factors:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and
> (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000) (adopting the test articulated by the Court of Criminal Appeals in Adkisson, 899 S.W.2d at 641-42 ). All five factors must be established by the record before an appellate court will recognize the existence of "plain error," and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. Id. In addition, the "'plain error' must [have been] of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642.

After a thorough review of the record in this case, we conclude that the plain error doctrine cannot afford the Defendant relief. First, the record is clear as to what happened in the trial court. The prosecutor argued that the State's witnesses had no reason to lie, while the Defendant and the Defendant's counsel were both liars. He further contended that the Defendant's claim of police misconduct was outlandish because police officers would not ruin their careers over the Defendant. The prosecutor also alleged that the Defendant was making the trial "racial" hoping that one or more jurors would "buy this." Finally, the prosecutor made some clearly irrelevant comments about his work habits and food preferences.

Although the manner in which these points were made arguably crosses the line into improper expressions of opinion or personal belief as to the credibility of witnesses, it is not clear that a clear and unequivocal rule of law has been breached. What is or is not improper argument may very well vary depending on the context in which it was made. See Judge, 539 S.W.2d at 343 (Tenn. Crim. App.1976) (holding that propriety of prosecution comments must be evaluated in light of whether they were in direct response to defense argument rather than gratuitous); see also Goltz, 111 S.W.3d at 6. The prosecutor's argument regarding the truthfulness of the witnesses and the unlikelihood of police misconduct were in direct response to the Defendant's assertion at trial that the State's witnesses were untruthful and the Defendant's testimony that the police committed misconduct when they interviewed him. The same might be said of the prosecutor's remarks commenting on the Defendant's attempt to make this case involve race. This statement was made in response to the Defendant's insinuation at trial that the police used two African-American officers to obtain a confession from the Defendant rather than a Caucasian officer. Accordingly, we cannot conclude that a clear and unequivocal rule of law was broken.

Further, it is impossible to say whether the complained of comments adversely affected the jury's verdict in this case and whether consideration of this issue is necessary to do substantial justice. It should be noted again that the burden of persuasion on appeal is on the Defendant to demonstrate that the prosecutor's comments "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). Other than the bare assertion that the prosecutor's comments deprived the Defendant of a fair trial, there is no indication that the jury was unduly swayed from its duties as explained in the jury instructions. Finally, and perhaps most importantly, there is no excuse or explanation proffered by the Defendant, either in the record or in his brief on appeal, as to the reason for his failure to object to the allegedly offending comments or his failure to raise this issue in his motion for a new trial. Thus, we cannot say that the failure to object was for reasons other than tactical. Under these circumstances we are of the opinion that the Defendant has failed to carry his burden of persuasion in convincing this Court to consider as plain error the propriety of the allegedly improper comments of the prosecutor in closing rebuttal. This issue is therefore waived.

## B. Sentencing

The Defendant next contends that the trial court improperly applied five enhancement factors when it sentenced him to ten years in prison. In a supplemental brief requested by this Court, the State counters that this issue is waived and that, even if not waived, any error in the trial court's ruling is harmless. When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401 Sentencing Comm'n Cmts.

Our review requires an analysis of: (1) the evidence, if any, received at the trial and sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offenses; (5) any mitigating or enhancement factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

In calculating the sentence for a Class B felony conviction, the presumptive sentence is the statutory minimum of eight years for a Range I offender if there are no enhancement or mitigating factors. See Tenn. Code Ann. § 40-35-210(c). If there are enhancement but no mitigative factors, the trial court may set the sentence above the minimum, but still within the range. Tenn. Code Ann. § 40-35-210(d). A sentence involving both enhancement and mitigating factors requires an

-14-

assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210(e). The sentence must then be reduced within the range by any weight assigned to the mitigating factors present. Tenn. Code Ann. § 40-35-210(e).

In the case under submission, in arriving at a mid-range sentence of ten years the trial court applied the following five enhancement factors and no mitigating factors:

> (6) the Defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense;
> (9) the Defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release into the community;
> (10) the Defendant possessed or employed a firearm during the commission of the offense;
> (11) the Defendant had no hesitation about committing a crime when the risk to human life was high; and
> (17) the crime was committed under circumstances under which the potential for bodily injury to a victim was great.

See Tenn. Code Ann. § 40-35-114.

The United States Supreme Court's recent opinion in Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004), calls into question the continuing validity of our current sentencing scheme. In that case, the Court, applying the rule in Apprendi v. New Jersey, 566 U.S. 466, 490 (2000), struck down a provision of the Washington sentencing guidelines that permitted a trial judge to impose an "exceptional sentence" upon the finding of certain statutorily enumerated enhancement factors. 124 S. Ct. at 2537. The Court observed that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" 124 S. Ct. at 2537. Finally, the Court concluded that "every defendant has a *right* to insist that the prosecutor prove to a jury [beyond a reasonable doubt] all facts legally essential to the punishment." Id. at 2539.

None of the enhancement factors used by the trial court to enhance the Defendant's sentence were submitted to a jury or admitted by the Defendant. Therefore, the rule in Blakely precludes application of any of these factors. Because there are no enhancement factors that were proved to a jury beyond a reasonable doubt or admitted by the Defendant, the sentence must be modified to eight years, the presumptive minimum.

### C. Jury Instruction

The Defendant contends, in a supplemental letter to this Court, that the trial court improperly gave an instruction to the jury "after hours of deliberating." The Defendant contends that "Rule 30 of the Criminal Procedure states that any instruction giving [sic] must be instructed before the jury retires to consider the verdict." This issue was not properly raised on appeal and, therefore, we

conclude that it is waived. Tenn. R. App. P. 36(a).

### III.  Conclusion

In accordance with the foregoing authorities and reasoning, the judgments of the trial court are affirmed as modified. The Defendant's sentence is modified to eight years. We therefore remand for the entry by the trial court of an amended judgment to indicate a sentence of eight years to be served by the Defendant in the Tennessee Department of Corrections.

_____
ROBERT W. WEDEMEYER, JUDGE