# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs July 23, 2013

## CHRISTY D. NAILLON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Sevier County**
**No. 16335-II    Richard R. Vance, Judge**

---

**No. E2012-02174-CCA-R3-PC - Filed September 24, 2013**

---

Christy D. Naillon ("the Petitioner") pleaded guilty to one count of aggravated child abuse. As part of her plea agreement with the State, the trial court sentenced her to fifteen years' incarceration. The Petitioner subsequently filed for post-conviction relief, which the post-conviction court denied following an evidentiary hearing. The Petitioner now appeals, arguing that her indictment was deficient, that she received ineffective assistance of counsel, and that her guilty plea was not entered knowingly, intelligently, and voluntarily. After reviewing the record and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS, J., joined. NORMA MCGEE OGLE, J., not participating.

Dennis C. Campbell, Sevierville, Tennessee, for the appellant, Christy D. Naillon.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; James B. Dunn, District Attorney General; and George Ioannides, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Petitioner was indicted by a Sevier County grand jury on January 13, 2009, for one count of aggravated child abuse, a class A felony. She pleaded guilty on May 3, 2012. Initially, retained counsel represented the Petitioner at the preliminary hearing in this matter.

The Petitioner subsequently was determined to be indigent and was appointed counsel. Appointed counsel ("Counsel") represented the Petitioner during the guilty plea proceedings.

*Guilty Plea*

At the plea hearing, the trial court informed the Petitioner of her constitutional rights. Additionally, the State recited the factual basis for the Petitioner's plea as follows:[1]

> [O]n August 6, 2008, both the Gatlinburg Police Department and the fire department were dispatched to a call for an unresponsive infant at 205 Bishop Lane. The child was actually taken then to the Sevier County Hospital. A CT scan was done, according to the hospital records and the witnesses there at the hospital. She was further transported to Children's Hospital for additional evaluation. There it was confirmed that she had some bleeding around the brain and some hemorrhages around the right eye. The doctors there will testify to that, including Dr. Perales. Her mental state was affected, it was abnormal. She began having some seizures. The injuries were severe. It was indicated that it was non-accidental, or inflicted, trauma according to witnesses. Detective Tim Williams was notified on August 7th. He responded. His investigation led to this defendant. The defendant had babysat the baby at the parents' request. They knew each other. There was a video surveillance of the child being handed to the defendant at the motel where she worked here in Gatlinburg. The investigation revealed that this baby was shaken and hurt. When the defendant was confronted with this evidence by Detective Williams, she confessed. She said that she forcefully shook the baby because she would not stop crying. This all happened here in Sevier County. Obviously the child was five months old at the time.

The Petitioner agreed that, had she gone to trial, the evidence she expected to be presented was similar to the facts recited by the State. The Petitioner also stated that she was satisfied with Counsel's representation and that she was entering her plea freely and voluntarily. When asked, the Petitioner denied taking any medications or having any conditions that would keep her from understanding or making decisions. The Petitioner stated that she understood her plea agreement to mean that she would be incarcerated for fifteen years at 100% as a Range I offender.[2] The court accepted the Petitioner's plea of guilty and entered judgment against her.

---

[1] For ease of reading, we have redacted the prosecutor's frequent use of the term "Your Honor."

[2] This sentence is the minimum allowed by statute. See Tenn. Code Ann. §§ 40-35-111(b)(1), 40-35-501(i)(2)(K) (Supp. 2008).

-2-

*Post-Conviction*

At the post-conviction hearing, Counsel testified that she was a public defender employed in Sevier County and that she was appointed to be the Petitioner's attorney when the Petitioner was found indigent. She first met with the Petitioner on May 12, 2009, and discussed the charges, including lesser-included offenses, against the Petitioner. Counsel kept a chronological list of her contacts with the Petitioner. Although she did not record every phone call, she wrote down "most of the important stuff." Counsel did not discuss a plea with the Petitioner during their first meeting, and there was no plea agreement in place at that time. Counsel had not received discovery at the time of the meeting.

Counsel met with the Petitioner twice. The first meeting lasted over an hour, and the second meeting lasted at least an hour. Counsel failed to note the second meeting in her list of contacts with the Petitioner because both she and the Petitioner were extremely emotional during the second meeting. The Petitioner indicated that she never meant to harm the victim. The Petitioner related that she became frustrated when she could not soothe the victim and shook the victim in response. Counsel admitted that she did not inquire about the Petitioner's education and did not know that the Petitioner had been in special education classes. Counsel testified that the Petitioner seemed articulate and gave no indication that she had any limited intellectual ability. Counsel specifically asked the Petitioner if she had ever received any psychological treatment, and the Petitioner denied receiving any such treatment.

Counsel did not request the file that the Petitioner's retained counsel had prepared for the preliminary hearing. Counsel did not listen to the audio recording of the Petitioner's police interview because it was not made available to her, and she did not request it. The discovery she received did not state that such a recording was available. She knew that the police interviewed the Petitioner at least twice and that the Petitioner did not sign a waiver for those interviews. Counsel did not inquire as to whether the victim had any history of seizures or accidents prior to this incident, but she did request to receive all of the victim's medical records.

Counsel stated that she discussed a reduced plea with the Petitioner on "many occasions." Counsel was clear that she thought a reduced plea was the Petitioner's best option in the case, especially because the Petitioner had made a written confession. Counsel felt that getting the charge reduced to a Class D felony would be the best option because the Petitioner potentially could have been sentenced to probation. Counsel felt the Petitioner was an excellent candidate for probation. The biggest hindrance to this plan was the severity of the victim's injuries.

Counsel communicated with the victim's parents through written notes because she could not communicate with them verbally due to a language barrier. The victim's parents

spoke Spanish as their first language. The parents' written notes indicated that they supported the Petitioner and that they did not want the Petitioner to go to jail. The notes also described the Petitioner as "loving." Counsel did not interview any witnesses besides the Petitioner.

Counsel did not file any motions to suppress evidence. She did speak with the detective working on the case. She went over the basics of discovery with the detective, and she described his case file as "very detailed." Counsel stated that the plea agreement was drafted before the day of the plea hearing. She stated that, although she had no independent recollection of writing the agreement, her practice was to write plea agreements before plea hearings, usually a week beforehand. Counsel never discussed the possibility of a trial with the Petitioner. Counsel reviewed the terms of the plea agreement well before the plea hearing, and she went over the written agreement with the Petitioner in court before the Petitioner signed the agreement.

On cross-examination, Counsel stated that she had represented clients charged with Class A felonies in over thirty cases and that several of those cases went to trial. Before becoming a lawyer, Counsel worked for five-and-a-half years as a probation and parole officer in Knoxville, Tennessee. Her normal practice after arraignment was to collect as much documentary evidence as possible and set up a meeting with the defendant. She met the Petitioner a couple of weeks after receiving discovery. Counsel described the evidence against the Petitioner as "overwhelming," and Counsel did not believe any other information was available to her when she advised the Petitioner as to whether she should go to trial. The State and Counsel agreed to reset the plea hearing date several times in order to see if the victim's condition improved. The initial offer of a Class D felony charge was rescinded in February of 2010, after it became clear from the victim's medical records that the victim had not shown significant improvement and probably would have permanent brain damage. The State then informed Counsel that the State only would offer a plea to a Class A felony.

After the offer of a Class D charge was rescinded, Counsel met with the Petitioner on April 1, 2010, to discuss a possible plea to the Class A felony. She communicated the offer to the Petitioner, and the Petitioner had one month to consider it. The Petitioner did not raise any questions about the plea during that meeting. Counsel was certain that she explained and that the Petitioner understood the meaning of serving a sentence at 100%. She could not recall if she discussed whether the Petitioner would get credit for good behavior. Counsel was confident that the Petitioner did not have any questions about the plea on April 22, 2010, when Counsel spoke with her on the phone. On the morning of the plea hearing, Counsel reviewed the plea agreement "in great detail" with the Petitioner, and the Petitioner signed it. The Petitioner did not ask any questions during the plea hearing.

Counsel stated that the Petitioner could read and write and that they never had any difficulty communicating. The Petitioner did not have a driver's license, and the Petitioner's mother transported her to meet with Counsel. Counsel did not know if the Petitioner was employed, but she did not believe that fact was relevant to the case. The Petitioner did not exhibit signs of illiteracy, difficulty comprehending, or difficulty retaining information. Counsel normally relied on these indicators when deciding to request a mental evaluation of a defendant, and, based on these indicators with the Petitioner, she decided one was not needed in this case. Counsel observed that the Petitioner had a better memory than most of Counsel's clients and did not have a history of drug abuse.

Counsel stated that she specifically considered whether the Petitioner's statements could be suppressed. Ultimately, she determined that the confession given to law enforcement officers could not be suppressed because the Petitioner was not in custody when she gave it. Counsel acknowledged that she did have the recordings of the Petitioner's interview with law enforcement officers at one point, but she had them placed in the record. Counsel explained that the reason she testified on direct examination that there were no recordings was because she had forgotten that she placed them in the record. She stated that it was her practice to view or listen to any CD or DVD she is given but that she did not have an independent recollection of listening to the recordings related to the Petitioner's case.

On redirect examination, Counsel described the Petitioner as "inexperienced." On questioning by the post-conviction court, Counsel stated that she had tried approximately forty jury trials and had handled thousands of cases. She handled about two hundred cases every year. In those previous cases, she interviewed witnesses, performed cross-examinations, and gained intuition about witnesses and witness performance. She had experience in evaluating the State's case. Counsel never had any doubts regarding the Petitioner's mental competency and whether the Petitioner understood the charges. Counsel stated that she knew of nothing to do differently in her representation in which she could have obtained a better result for the Petitioner.

Arlen Barahona Rios, the victim's father, testified through the assistance of an interpreter. On direct examination, he stated that he met the Petitioner through the Petitioner's boyfriend. The Petitioner babysat the victim once or twice a week, although not necessarily every week. The Petitioner took "good care" of the victim and even bought necessities for the victim with her own money. Rios was present the day of the incident and was the first to call 911. When he could not communicate well enough with the 911 dispatcher to receive assistance, the Petitioner spoke with the dispatcher for him. Rios never met with Counsel.

Rios believed the Petitioner did not injure the victim on purpose, and he stated that the Petitioner loved the victim. He did not want the Petitioner to go to jail. Rios stated that

if the Petitioner had meant to harm the victim, she would not have brought the victim to her parents when the victim became unresponsive.

Rios testified that the victim was born on March 1, 2008, and did not have any medical issues at birth. After the incident, the victim remained in the hospital for fifteen to twenty days, and she since had been treated by a neurologist for seizures. At the time of the post-conviction hearing, the victim had not had a seizure in three years. She recently had seen a neurologist, and the neurologist was planning to stop prescribing seizure medication to the victim. Over objection, Rios testified that the neurologist told him that the victim might not learn to walk until she was age five, six, or seven. However, the victim actually began walking at age three. Despite her progress, the victim still had balance issues. The victim also had an eye injury as a result of the incident that required her to wear special eyeglasses. The victim never exhibited any of these medical conditions until the incident. Rios learned from doctors at the hospital that the conditions were a result of the trauma the victim suffered.

Edalina Chavez, the victim's mother, testified through an interpreter that she lived in Gatlinburg. She was employed at Bearskin Lodge, where she worked with the Petitioner. According to Chavez, the Petitioner was "very good" with the victim, and the Petitioner loved the victim. The Petitioner would buy gifts for the victim, including food and clothes. Chavez never saw the Petitioner mistreat the victim. The Petitioner also watched another child named Wilcon, and she "was good" with that child as well. Chavez was grateful to the Petitioner for bringing the victim to her when the victim became unresponsive and for calling the ambulance.

Chavez never spoke with Counsel, but she did speak with the district attorney, although she could not recall any specifics about that conversation. She also spoke with the investigating detective several times and told him that she thought the incident was an accident.

On cross-examination, Chavez stated that she met the Petitioner five years earlier, before the victim was born, when she started working at Bearskin Lodge. Both Chavez and the Petitioner worked as cleaners. She mainly communicated with the Petitioner through the Petitioner's boyfriend, who spoke Spanish. She never saw the Petitioner driving and did not know if the Petitioner had a driver's license. Chavez never had concerns about the Petitioner not understanding how to care for the victim. Despite their inability to speak each other's language, Chavez testified that she and the Petitioner "understood each other."

Chavez confirmed that the victim had no health problems until the incident in August 2009. She was not present when the victim was injured. The doctor at the hospital told Chavez that the victim had been hit on the side of the head, that her brain was bleeding, and

that the bleeding caused pressure to build up on the victim's brain. The doctor did not explain how the victim was hit on the head. The victim was seeing a neurologist and a pediatrician, and she was taking Topomax for seizures. The victim needed special glasses for one of her eyes because it also was injured as a result of the incident.

Detective Tim Williams of the Gatlinburg Police Department testified that he had been a detective for fourteen years and had served as a police officer for a total of twenty-five years. He was the lead detective in the case. He testified that on August 6, 2008, emergency personnel responded to the location of a 911 call regarding an unresponsive child. The child was transported first to Sevier County Hospital and then to Children's Hospital. He initially was contacted about the case by the Department of Children's Services ("DCS").

Detective Williams first interviewed the Petitioner on August 7, 2008. He did not have the Petitioner sign a release for the interview, and he did not inform the Petitioner that she did not have to answer his questions. He was wearing plainclothes, but he had his badge and his firearm. In Detective Williams' first interview with the Petitioner, she accounted for the victim's injuries by stating that she bumped the victim's head with her elbow while carrying her. The Petitioner appeared "upset" about the situation during their first interview. The Petitioner was the only person to describe the injury as a "bump to the head." Medical personnel later informed Detective Williams that it was "a classic shaken baby episode."

When asked about the Petitioner's intelligence, Detective Williams described the Petitioner as "simple-minded but understanding," and he agreed that "child-like" was a good term to describe her.

On cross-examination, Detective Williams acknowledged that he was not the only police officer involved in the case. He became involved in the case after the Petitioner gave an initial statement, and he did not speak with the officers who responded to the 911 call. Instead, he relied on police reports, information he received from DCS, and medical information provided by the hospitals. He also viewed a video of the hotel lobby where the Petitioner brought the unresponsive victim to meet the victim's parents and interviewed the hotel clerks who were on duty at the time.

Detective Williams took a second oral statement from the Petitioner within twenty-four hours of her first statement. The Petitioner stated that, on the evening of the incident, she realized something was wrong when she could not get the victim to respond when she tried to wake the victim.

Detective Williams consulted with a Dr. Perales at Children's Hospital after taking this second oral statement. Dr. Perales told the Detective that the Petitioner's statement did not account for the victim's injuries. Detective Williams testified that he was "pretty sure"

a doctor told him that the injury was not an impact injury and was "made very certain at some point that [it] was not an impact injury" but rather a "back and forth injury that caused injuries to nerves and blood vessels within [the victim's] head."

Detective Williams, using this knowledge, confronted the Petitioner with the fact that the victim's injuries were not consistent with her statement. The Petitioner then "blurted out" that she shook the victim. This third statement was taken over the course of "a couple of hours." Detective Williams eventually had her write a statement on yellow notebook paper. He presented the original of the written statement at the hearing, and it was entered into evidence. Based on the written statement, Detective Williams consulted with a district attorney, and a warrant for the Petitioner's arrest was issued. The Petitioner made a phone call to Detective Williams regarding turning herself into custody, which he recorded and turned over to the district attorney's office. The Petitioner surrendered herself into custody.

Detective Williams never had concerns that the Petitioner was mentally challenged, although he opined that she was not highly educated. He asked the Petitioner if she was under the influence of anything when she gave her statements, and she responded "no."

Melissa Naillon, the Petitioner's mother, testified that the Petitioner was in special education classes throughout elementary and high school. The Petitioner required "a lot of help" and had trouble obtaining her GED. The Petitioner did not have any education after high school, and she never obtained a driver's license. The Petitioner had trouble "understanding things," and she would "get upset" when she did not understand something. The Petitioner obtained her job because she accompanied her mother to work. The hotel eventually employed the Petitioner because she was already on the premises and knew how to perform the position's duties. The Petitioner's mother also worked with the victim's mother. The Petitioner began babysitting the victim when the victim was two months old. The Petitioner also babysat another child named Wilcon.

The Petitioner's mother attended the Petitioner's plea hearing. She did not know what was going to happen at the plea hearing. According to the Petitioner's mother, Counsel never let her sit in on meetings with Counsel and the Petitioner. The Petitioner's mother claimed that she was told she "couldn't come in" to these meetings, even though she wanted to be present because the Petitioner did not understand the situation.

On cross-examination, the Petitioner's mother stated that the Petitioner currently was imprisoned in Memphis. She corrected her previous statement and testified that the Petitioner received a diploma, as opposed to a GED, from Cosby High School. The Petitioner spoke very little Spanish. The Petitioner was able to make bail with help from her family. The Petitioner did not have a driver's license, and the Petitioner's mother took the Petitioner to the public defender's office on two occasions. The Petitioner's mother did not

know anything about the plea agreement until the plea hearing, and the Petitioner believed she would be on probation until the sentencing occurred. The Petitioner's family prepared her to go to jail the day of the plea hearing, but they believed the Petitioner would be returning home.

Melinda Garber, the Petitioner's aunt, reiterated that the Petitioner graduated from Cosby High School and that the Petitioner had been in special education classes. She also worked with the Petitioner's mother at Bearskin Lodge in Gatlinburg. She testified that the Petitioner bought clothes for the victim and took "good care" of her. The Petitioner also watched other children. She found it a "shock" that the Petitioner went to jail on the day of her plea hearing. On cross-examination, Garber admitted that the only time she actually had been to court regarding these charges against the Petitioner was the day of the Petitioner's plea hearing.

The Petitioner testified that she was twenty-seven years old at the time of the post-conviction hearing. She attended Cosby High School. She was held back in second grade and took special education classes throughout high school. The Petitioner confirmed she did not have a driver's license. The Petitioner worked at Bearskin Lodge, where she met the victim's mother. The Petitioner stated that she would do "about everything" for the victim. The Petitioner called 911 when the victim became unresponsive and traveled to the hospital with the victim. She cooperated with investigating officers. She stated that the investigating officers never told her that she could leave her interview or that she did not have to talk to them. The Petitioner never had been "in trouble" before, although she admitted that she was arrested at age twenty-five.

The Petitioner hired an attorney to represent her at her preliminary hearing. She could not afford his services after the preliminary hearing, so she was appointed counsel after the preliminary hearing. The Petitioner stated that she met with Counsel for a total time of less than two hours. The Petitioner was unsure if she ever was shown the statute she violated and could not remember if Counsel explained the elements of the crime to her. She told Counsel that the incident was an accident.

The Petitioner claimed she never saw the plea agreement before she signed it. Additionally, she did not know if she was going to jail after her plea hearing, although she knew it was a possibility. She reiterated that she did not know what she was agreeing to in her plea agreement because she only had "a few seconds" to look at it. She claimed that she never went over the evidence with Counsel and that she never heard the recordings of her interviews.

On cross-examination, the Petitioner stated that she started working on weekends at the Bearskin Lodge while she was a sophomore in high school. She learned what Spanish

she knew from her boyfriend, whom she had dated for eight years. According to the Petitioner, her boyfriend did not know much English. The Petitioner had several friends who spoke Spanish, and she agreed that she knew enough to "get by." She would ask for the help of a fellow employee if she needed a translator when speaking to the victim's mother.

The Petitioner admitted that she knew there was a problem after shaking the victim, which is why she took the victim to the victim's mother and called 911. The Petitioner stated that she originally did not give the entire truth to police officers because she was scared of getting into trouble, and she admitted to doing something wrong. The Petitioner acknowledged that Detective Williams did not force her to say anything or "put words in [her] mouth" regarding the incident. Additionally, she acknowledged that he gave her a courtesy call regarding the arrest warrant. After being arrested, the Petitioner posted bond and met with her retained counsel approximately two to five times. According to the Petitioner, the Petitioner's retained counsel told her that she was charged with aggravated child abuse and that the sentence for that crime was approximately fifteen to twenty-five years. She could not remember if he explained the evidence to her or not, although he did go over the police report with her after the preliminary hearing. She knew from the preliminary hearing that she was being charged with a Class A felony and that a conviction could result in a fifteen-year sentence at 100%. The Petitioner agreed that retained counsel explained the evidence presented at the preliminary hearing to her. The Petitioner understood that Counsel's strategy was to delay pleading guilty in order to determine if the victim's condition would improve, which would have resulted in the charge being reduced to a Class D felony.

The Petitioner admitted that she met with Counsel sometime before her plea hearing to discuss the plea agreement. She understood that the sentence would be fifteen years at 100%. According to the Petitioner, she never discussed the plea with her family because it was too emotional for her. She admitted that the plea agreement was "exactly what [she] expected" and that she had discussed the possibility of going to jail with Counsel several times. She admitted that, at the plea hearing, the trial court advised her of all her rights and that she testified that she was satisfied with Counsel's representation. When questioned by the plea court as to whether she was on any medications, she answered no, and she understood that she was giving up her right to a jury trial. The Petitioner's post-conviction petition was filed by other inmates working as "law clerks" at the prison's law library.

On redirect examination, the Petitioner stated that she never discussed the possibility of a trial with Counsel and that she knew she was going to jail.

After hearing the evidence, the post-conviction court made findings from the bench. The court found

> no evidence whatsoever of any type of mental defect, disease, disability, or limitation that would affect [the Petitioner's] competency or ability to understand. In fact, her testimony today shows that she was able to understand, comprehend, and answer questions directly, which contradicts the proposition that she did not understand what her plea was.

The post-conviction court also found that the reason the Petitioner's family was unaware she would be going to jail was because the Petitioner did not tell them. The court further found that "[t]here is no question . . . that [the Petitioner] fully understood what the plea agreement was, she knew the ramifications of it, she knew the effect of it, she understood it, and that her plea was voluntarily and knowingly made." Additionally, the post-conviction court stated that there was "no question raised by any evidence of any proof that would reasonably foreseeably change the outcome if [the Petitioner] had gone to trial." Finally the post-conviction court found "that whatever [Counsel] didn't do had no prejudicial effect. In fact, what she did do was obtain for [the Petitioner] the minimum sentence for this offense."

The post-conviction court confirmed denial of the Petitioner's petition for post-conviction relief on October 9, 2012, by written order. The Petitioner timely filed her notice of appeal, and this appeal followed. On her appeal from the post-conviction court's judgment, the Petitioner challenges the sufficiency of the indictment against her, asserts that she received ineffective assistance of counsel, and claims that she did not enter her plea knowingly, voluntarily and intelligently.

## **Analysis**

### *Standard of Review*

Post-conviction relief is available only when the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). To prevail on a post-conviction claim of a constitutional violation, the petitioner must prove his or her allegations of fact by "clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2006). See Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court will not overturn a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence.

-11-

Momon, 18 S.W.3d at 156. With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is de novo with no presumption of correctness. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

*Defective Indictment*

The Petitioner first argues that the indictment did not specify the charge of aggravated child abuse, and, therefore, the indictment is fatally defective. The State argues that this issue was not addressed in the petition for post-conviction relief, and, accordingly, it has been waived under Tennessee Rule of Appellate Procedure 3(e). The Petitioner admits that this issue typically would be waived due to the failure to raise it in the petition for post-conviction relief. Yet, she insists that the issue is properly before this Court in this case because the indictment's deficiency is plain error, and, thus, this Court can review the issue sua sponte. The State argues that this issue is not appropriate for plain error review because it fails the factors required in State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994).

Initially, we note that plain error review is not available on a post-conviction appeal to issues "that would otherwise be deemed either waived or previously determined." Grindstaff v. State, 297 S.W.3d 208, 219 (Tenn. 2009). We also note, however, that a claim that an indictment is so defective as to deprive the trial court of jurisdiction may be brought at any time. See Dykes v. Compton, 978 S.W.2d 528, 529 (Tenn. 1998) (holding that a defective indictment claim may be made in a habeas corpus proceeding because "[a] valid indictment is an essential jurisdictional element, without which there can be no prosecution") (citations omitted).

In this case, the indictment alleged that the Petitioner "did unlawfully, knowingly, and feloniously, other than by accidental means, inflict injury upon [the victim], a child under eight (8) years of age, so as to adversely affect the health and welfare of said child, in violation of T.C.A. 39-15-402." The Petitioner contends that this language was insufficient to charge the offense of aggravated child abuse. We disagree.

Tennessee Code Annotated section 39-15-402, the statute referenced in the indictment, sets forth the offense of aggravated child abuse. Aggravated child abuse is committed when the perpetrator engages in an act of child abuse as defined in section 39-15-401(a) and serious bodily injury to the child results. Tenn. Code Ann. § 39-15-402(a)(1) (2006). Our supreme court has declared that an indictment meets constitutional muster if it "provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997) (citations omitted). This Court has recognized that "indictments which

reference the relevant statute have been found to be sufficient even though they omit an essential element of the offense." Russell Epperson v. State, No. W2001-02579-CCA-R3-PC, 2002 WL 1841649, at *9 (Tenn. Crim. App. Aug. 9, 2002), perm. appeal denied (Tenn. Dec. 2, 2002) (citing State v. Carter, 988 S.W.2d 145, 149 (Tenn. 1999); Ruff v. State, 978 S.W.2d 95, 100 (Tenn. 1998)). We hold that the indictment in this case was adequate. Accordingly, the Petitioner is not entitled to relief on this issue.

*Validity of the Guilty Plea*

The Petitioner also argues that her guilty plea was not entered knowingly, intelligently, and voluntarily. The Petitioner claims that she did not have time to carefully consider the plea offer and that she did not understand the charge against her. The Petitioner also argues that Counsel never explained the elements of the offense and that Counsel's failure to understand the indictment resulted in the Petitioner's pleading to a charge of which she was not accused.[3] The State argues that the Petitioner's plea was knowing and voluntary and that any factual allegations to the contrary were explicitly rejected by the post-conviction court. We agree with the State.

To be valid, a guilty plea must be entered knowingly, voluntarily, and intelligently. See Boykin v. Alabama, 395 U.S. 238, 242-44 (1969); State v. Mackey, 553 S.W.2d 337, 340 (Tenn. 1977), superseded on other grounds by Tenn. R. of Crim. P. 37(b) and Tenn. R. of App. P. 3(b). A plea passes constitutional muster when the defendant understands both what the plea connotes and its consequences, Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (citing Boykin, 395 U.S. at 244), and makes a voluntary and intelligent choice from the alternative courses of action available to plead guilty, Jaco v. State, 120 S.W.3d 828, 831 (Tenn. 2003) (citing North Carolina v. Alford, 400 U.S. 25, 31 (1970)). In Mackey, our supreme court set forth the procedure that a trial court should follow when accepting a guilty plea in order to ensure that a defendant's plea is knowing, voluntary, and intelligent. 553 S.W.2d at 341; see also Tenn. R. Crim. P. 11(b). A trial court must "substantially" comply with this procedure. State v. Newsome, 778 S.W.2d 34, 38 (Tenn. 1989).

As set forth above, a petitioner in a post-conviction proceeding must establish his right to relief by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f); Momon, 18 S.W.3d at 156. We have reviewed the guilty plea hearing transcript, and we conclude that the plea was constitutionally sound. The Petitioner testified that she understood her right to a jury trial and her right to present a defense. She also stated that she understood what her

---

[3] The Petitioner asserts that her guilty plea was the result of ineffective assistance of counsel and therefore was not entered knowingly, voluntarily, and intelligently. Out of an abundance of caution, we address the validity of the Petitioner's guilty plea on its own merits here and separately address any effect the allegedly ineffective representation may have had on the guilty plea later in this opinion.

plea agreement entailed. The Petitioner admitted that her retained counsel informed her about the charge and went over the evidence presented at the preliminary hearing. Moreover, Counsel testified that the Petitioner knew the plea agreement's contents before the day of her the plea hearing. Indeed, Counsel testified that the Petitioner had one month to consider the plea bargain.

Although witnesses testified that the Petitioner was in special education classes during school, the post-conviction court rejected the implication that the Petitioner was not intellectually competent to understand her plea, holding that her plea was knowing and voluntary. Counsel stated that she never had concerns about the Petitioner's ability to understand and even testified that the Petitioner had a better memory than most of her clients. At no point during this case did the Petitioner indicate that she had taken any substance that would impair her ability to understand or comprehend the proceedings. The Petitioner did not present clear and convincing evidence that her plea was not entered knowingly, intelligently, and voluntarily. Accordingly, the Petitioner is not entitled to relief on this issue.

*Ineffective Assistance of Counsel*

The Petitioner also argues on appeal that she was denied the effective assistance of counsel on eight different grounds. Specifically, the Petitioner asserts that Counsel: failed to conduct a reasonable investigation; failed to file pretrial motions; failed to move for a continuance in order for the Petitioner to have time to consider the plea offer; failed to explain the offense statute to the Petitioner; failed to research case law pertaining to the Petitioner's case; failed to prepare for trial, telling the Petitioner that she would receive twenty-five years in prison if she did not take the plea agreement; and incorrectly assumed that the indictment charged a Class A felony when, in reality, it charged a Class D felony. The Petitioner argues that these errors prejudiced her because, but for Counsel's errors, she would have gone to trial and received, at most, a four-year sentence. We will address the majority of these alleged deficiencies and whether they prejudiced the Petitioner together. However, we will address separately the Petitioner's claim of ineffective assistance of counsel regarding the indictment.

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial.[4] Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, whose advice is "within the range of competence demanded of attorneys in criminal cases." Strickland v. Washington,

_____

[4] The Sixth Amendment right to counsel is applicable to the States through the Fourteenth Amendment to the United States Constitution. See Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

466 U.S. 668, 687 (1984); <u>see also</u> <u>Baxter v. Rose</u>, 523 S.W.2d 930, 936 (Tenn. 1975). The deprivation of effective assistance of counsel at trial presents a claim cognizable under Tennessee's Post-Conviction Procedure Act. <u>See</u> Tenn. Code Ann. § 40-30-103; <u>Pylant</u>, 263 S.W.3d at 868.

In order to prevail on a claim of ineffective assistance of counsel, a petitioner must establish two prongs: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense. <u>See</u> <u>Strickland</u>, 466 U.S. at 687; <u>Goad v. State</u>, 938 S.W.2d 363, 369 (Tenn. 1996). A petitioner's failure to establish either prong is fatal to his or her claim of ineffective assistance of counsel. <u>Goad</u>, 938 S.W.2d at 370. Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong. <u>Id.</u>

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" <u>Vaughn v. State</u>, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting <u>Strickland</u>, 466 U.S. at 688)). Our supreme court has explained that:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

<u>Baxter</u>, 523 S.W.2d at 934-35 (quoting <u>Beasley v. United States</u>, 491 F.2d 687, 696 (6th Cir. 1974)). When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." <u>Howell v. State</u>, 185 S.W.3d 319, 326 (Tenn. 2006) (citing <u>Strickland</u>, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" <u>State v. Honeycutt</u>, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting <u>Strickland</u>, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. <u>Rhoden v. State</u>, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." <u>Cooper v. State</u>, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing <u>Hellard v. State</u>, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, a petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). In the context of a guilty plea, our analysis of this prong

> focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the "prejudice" requirement, the [petitioner] must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.

Hill v. Lockhart, 474 U.S. 52, 59 (1985). See also Calvert v. State, 342 S.W.3d 477, 486 (Tenn. 2011).

## Indictment

As to the Petitioner's claim of ineffective assistance of counsel regarding the indictment, we note that Counsel was not questioned about her understanding of the indictment or as to why she did not raise any challenge to it. Accordingly, the Petitioner has failed to establish by clear and convincing evidence that Counsel performed deficiently by not challenging the indictment prior to the Petitioner pleading guilty. This same reasoning also applies to the Petitioner's claim that she pleaded guilty to the aggravated child abuse charge as a result of Counsel's alleged lack of understanding about the indictment. The Petitioner is not entitled to relief on this issue.

## Other Alleged Deficiencies

The Petitioner also claims that Counsel failed to conduct a reasonable investigation; failed to file pretrial motions; failed to move for continuance in order for the Petitioner to have time to consider the plea offer; failed to explain the offense statute to the Petitioner; failed to research case law pertaining to the Petitioner's case; and failed to prepare for trial, telling the Petitioner that she would receive twenty-five years in prison if she did not take the plea agreement. Turning first to the prejudice prong, we note that the Petitioner has not presented any direct evidence, much less the clear and convincing evidence required by our standard of review, to establish that the Petitioner would have gone to trial absent these alleged errors of Counsel. See Tenn. Code Ann. § 40-30-110(f). In fact, all of the testimony, including the Petitioner's, establishes that she did not even consider going to trial. Although prejudice also may be shown by circumstantial evidence, Grindstaff, 297 S.W.3d at 222, the Petitioner, likewise, has not presented any circumstantial evidence establishing a reasonable probability that she would have gone to trial absent Counsel's alleged errors. We also note that the post-conviction court's findings implicitly accredit Counsel's testimony. As a result,

-16-

the Petitioner has failed to establish prejudice.  Because we have determined that the Petitioner has failed to establish prejudice, we decline to address whether Counsel's representation was deficient in these areas.  See Goad, 938 S.W.2d at 370.

## CONCLUSION

Based on the reasoning above, the Petitioner has failed to establish that she is entitled to post-conviction relief.  Therefore, we affirm the judgment of the post-conviction court.


_____
JEFFREY S. BIVINS, JUDGE