IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 25, 2017

## STATE OF TENNESSEE v. DANIEL STEPHEN COLLINS

**Appeal from the Criminal Court for Hawkins County**
**No. CC-15-CR-77     John F. Dugger, Jr., Judge**

_____

### No. E2016-02580-CCA-R3-CD

_____

The Defendant, Daniel Stephen Collins, was convicted by a Hawkins County jury of the aggravated sexual battery of his eight-year-old daughter, a Class B felony, and was sentenced by the trial court to nine years at 100% in the Department of Correction. The Defendant raises three issues on appeal: (1) whether the evidence was sufficient to sustain his conviction; (2) whether the trial court erred by not qualifying the victim as a competent witness and by allowing the prosecutor to lead her testimony; and (3) whether the presentment was constitutionally defective because it failed to charge the crime for which he was convicted. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

John D. Parker, Jr. (on appeal and at trial) and Steven C. Frazier (at trial), Kingsport, Tennessee, for the appellant, Daniel Stephen Collins.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Dan E. Armstrong, District Attorney General; and Ryan Blackwell and Cecil C. Mills, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTS

On December 22, 2014, the victim, the eight-year-old biological daughter of the Defendant, reported to her mother that the Defendant had pulled her pants down and "tickled" her "private" earlier that day while the victim's mother was at work. The next day, the victim's mother took the victim to the hospital, where she was examined by a physician and interviewed by an investigator with the Department of Children's Services ("DCS"). The Hawkins County Grand Jury subsequently returned a presentment charging the Defendant with the aggravated sexual battery of the victim.

At the Defendant's June 23, 2016 trial, the victim's mother testified that she and the Defendant had been married for ten years and had one child together, the victim, before their divorce became final in November 2015. On December 22, 2014, she and the Defendant were still married and lived together with the victim in a home in Church Hill. The victim, who was in the third grade at that time, was home for Christmas break, and the Defendant, who worked the 3:00 to 11:00 p.m. shift at Cooper Standard, kept the victim from the time the victim's mother left for her 8:30 a.m. to 5:00 p.m. job until he dropped her off at the home of her maternal grandparents between 2:00 and 2:30 p.m.

The victim's mother testified that when she left work that day, she went directly to her uncle's funeral, where she met her parents and the victim. Afterwards, she took the victim home, and they changed into their pajamas and sat down to watch television together. Not long after they sat down, the victim told her that she needed to tell her something. When the victim's mother muted the television and asked the victim what she needed to tell her, the victim said that "earlier that day that [the Defendant] had touched her private parts." The victim then stood up and demonstrated to her mother how she had been trying to hold her pants up while the Defendant was trying to pull them down. The victim said that the Defendant finally got her pants down to her mid-thigh, and she showed her mother exactly where the Defendant had touched her.

The victim's mother testified that she thanked the victim for telling her and told her that she would speak with the Defendant. She then watched a little more television with the victim, put the victim to bed, and waited for the Defendant to return home. As soon as he came into the bedroom after arriving home from work, she told him that she needed to talk to him and said that the victim had told her that he touched her "private parts." The Defendant "immediately got defensive and started hollering" that the victim was a liar. She told him to be quiet because the victim was in bed and after about five minutes he stopped talking, prepared for bed, and then got into bed. She eventually lay

down in bed with him, but she did not sleep. After another thirty minutes to an hour, the Defendant got up and took a shower before returning to bed.

The victim's mother testified that the Defendant got up once during the night to get a drink from the kitchen and that she followed him to make sure he did not go into the victim's bedroom. The next morning, she took the victim with her to work. That evening, she took the victim to the emergency room, where law enforcement and DCS were notified. She and the victim moved in with her parents that night, and they never again lived with the Defendant.

On cross-examination, the victim's mother agreed that the victim referred to the Defendant as having "tickled" her "private parts."

The ten-year-old victim testified that on the last day that she lived with the Defendant she was sitting on the couch watching television in her pajamas when the Defendant sat down beside her, pulled down her pajama pants to her ankles, pulled down her underwear, and tickled her "private" for about five minutes while her face was buried in the couch. She denied that she tickled the Defendant or that they were playing together at the time. After the Defendant stopped, she pulled up her pajama pants and underwear and got dressed in preparation for going to her grandmother's house.

The victim testified that after she had changed into a tee shirt and shorts, she went to the Defendant's room to see if he was ready to leave. At that point, the Defendant "did it again," pulling down her shorts and underwear and "tickl[ing]" her front "lower private." She asked him to stop, and he did after five minutes. The victim said that during the drive to her grandmother's house, the Defendant asked her not to tell her grandmother or her mother what had happened.

The victim testified that she did not tell her grandmother, but that night while the Defendant was gone, she told her mother that the Defendant had tickled her "private." She also showed her mother what the Defendant had done by "act[ing] it out, but without pulling [her] pants down or anything." The next morning, she accompanied her mother to her mother's workplace. Before leaving the house, she went into the Defendant's bedroom, where the Defendant was lying in bed with his eyes closed, and told him that she was sorry. She did not know if he was awake during her apology. The victim explained that she said she was sorry because she "felt guilty." She testified that she later went to the hospital, where she related what had happened to a detective and the medical staff.

- 3 -

At the request of the prosecutor, the victim circled on an anatomical drawing the portion of her body that the Defendant had touched. The drawing, on which the victim had circled the genital area, was admitted as an exhibit.

On cross-examination, the victim agreed that everyone occasionally makes mistakes and it was possible she might have made "a mistake or two along the way" as she was relating the events to the different individuals with whom she spoke. When defense counsel suggested that her face had been buried in the pillows because she and the Defendant had been "wrestling a little bit," she replied "[k]ind of." She also agreed that it was possible things had happened a little differently from the way she related them. However, on redirect examination, she testified that no one told her what to say and what she related on direct examination was true.

Detective Cliff Evans of the Hawkins County Sheriff's Department testified that he was dispatched to the hospital on December 23, 2014, in response to the child sexual assault complaint. After first meeting with Deputy Bryant Boggs, who explained what the allegations were, he and Investigator Jessica McGuire with DCS met with the victim's mother and the physician who examined the victim. Ms. McGuire spoke briefly with the victim behind closed doors, and Detective Evans also spoke briefly with the victim but did not ask her any specific questions about the incident.

Detective Evans testified that he interviewed the Defendant, who was accompanied by his lawyer, at the sheriff's department on January 5, 2015. The Defendant gave a brief written statement in which he said he had never improperly touched the victim. During the same interview, the Defendant also made the verbal statement that he and the victim had been wrestling and that he had been tickling her and "possibly could have accidentally touched her between the legs."

On cross-examination, Detective Evans testified that he talked to the victim at the hospital but did not ask her any questions about the incident. He said he observed from a separate room the victim's statement at DCS but did not participate in it. He explained that the victim might have misinterpreted his questioning about general topics such as her favorite sport and cartoon as an interrogation. He conceded that the Defendant did not mention any specific date when he made the comment about the possibility of having accidentally touched the victim during a wrestling play session. He said, however, that from the context he assumed the Defendant was discussing the date of the alleged incident.

Daniel Bishop, who had worked with the Defendant at Cooper Standard, testified that the Defendant brought up the charges against him during conversation, telling him

that the victim had come into the living room without any clothes on and how he "accidentally went inside her" while they were wrestling.

Joshua Stubblefield, a former machine operator at Cooper Standard, testified that the Defendant told him that he was "being investigated for his daughter," that he did not "do it," and that the victim had gotten "on top of him and forced him."

Dr. Joseph Ley, the pediatrician who interviewed and examined the victim at the hospital, estimated that over the course of his professional career he had evaluated at least one hundred children who complained of sexual abuse. He testified that the victim told him that the Defendant had touched her "private parts" and that it "was like a tickle." He asked if it had been painful, and she said it had not. Dr. Ley explained that when he interviews children who complain of sexual abuse, he approaches "from several different angles" in order to see if they provide a consistent story. The victim's "story stayed consistent, that she'd been touched in her private areas, that [the Defendant] had pulled her pants down to touch her and that it felt like a tickle."

Dr. Ley testified that the victim's hymen was not torn but presented an unusual appearance with "a white color change at the 5 o'clock position and a slight notch at the 7 o'clock position." Because the genital exam "was not entirely normal," he ordered tests for sexually transmitted diseases, which came back negative.

The Defendant testified as follows. On December 22, 2014, he got up at 9:30 a.m., got dressed, walked to the living room, sat on the couch to put on his work boots, and told the victim he would be outside if she needed him. He also told the victim that he loved her but received no response. He worked outside until about 11:30 a.m., came back inside, returned a phone call from his wife, and at noon sat down on one end of the couch to watch television with the victim, who was seated at the other end. The victim did not speak to him, and he and the victim did not interact.

At about 1:00 p.m., the Defendant's mother-in-law called and asked him to bring the victim to her house a little after 2:00 p.m. Shortly after 1:30 p.m., he told the victim to go change her clothes. He was still sitting on the end of the couch and in the process of changing his shoes. The victim ignored him, and he had to tell her four or five times before she finally got up and went into her bedroom. After fifteen minutes, the victim came out of her bedroom without wearing any clothes, threw her pajamas and panties in his face, and tried to jump in his lap. He pushed her off him onto the couch. The victim then "jumped around like a little monkey on the couch and pulled [his] left arm down onto the couch and wanted to wrestle, but she was laying [sic] on top of [his] arm." He told the victim to get up and go change her clothes, and she complied. He remained in

the living room, and when the victim came back dressed, he took her to her grandmother's house and then went to work.

The Defendant denied that he ever inappropriately touched the victim. He said that he and the victim sometimes wrestled and tickled each other, but they did not that day. He denied that he ever discussed the charges against him with his coworkers or said what they attributed to him. He said he had never been convicted or charged with any crime and had never even received a speeding ticket. He acknowledged it was possible he accidentally touched the victim when he pushed her off his arm but said it was not intentional and was not the result of anything he initiated. Finally, he testified that he loved his daughter, that they had had a close relationship, and that he was the parent who had provided most of her care.

On cross-examination, the Defendant agreed that the victim was "a good girl" but disagreed that she was honest.

Five witnesses testified on the Defendant's behalf that the Defendant had a good reputation in the community for honesty and was a hard worker: Larry Crawford, who estimated he had known the Defendant for twelve or thirteen years; the Defendant's stepmother, Inez Collins, who said she had known the Defendant since he was fifteen months old; the Defendant's step-aunt, Sarina Stewart; the Defendant's former long-time co-worker, Larry Dockery; and the Defendant's father, Hicks Collins. Mr. Crawford, Ms. Collins, and Mr. Collins additionally each testified that the Defendant appeared to have a very good relationship with the victim and that they had never seen him engage in any inappropriate behavior with her.

Following deliberations, the jury convicted the Defendant of the indicted offense and fixed the fine at $25,000. The trial court subsequently sentenced the Defendant as a Range I, standard offender to nine years at 100% in the Department of Correction. Thereafter, the Defendant filed a timely appeal to this court.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant first challenges the sufficiency of the evidence, arguing that the evidence was insufficient to sustain the conviction, the jury's verdict was contrary to the law and the evidence, and the trial court should have granted his motions for judgment of acquittal or a new trial based on the insufficiency of the evidence.

"The standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The Defendant was convicted of aggravated sexual battery, which, for the purposes of this case, is defined as the "unlawful sexual contact with a victim by the defendant" when "[t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4) (2014). "'Sexual contact' includes the intentional touching of the

victim's, the defendant's, or any other person's intimate parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" Id. § 39-13-501(6). "'Intimate parts' includes . . . the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" Id. § 39-13-501(2).

The Defendant contends that the "testimony of [the victim] was at odds with the testimonies of Detective Evans, Daniel Bishop, and Joshua Stubblefield." Specifically, he asserts that their testimonies "were consistent with each other" and "supported the defense theory that any touching was accidental[.]" The State responds that the jury was within its right to accredit the victim's testimony, which established that the victim was sitting on the couch watching television when the Defendant pulled down her pants and underwear, touched her "private" for about five minutes, and then instructed her not to tell her grandmother or mother what he had done. We agree with the State.

Viewed in the light most favorable to the State, the proof was sufficient for the jury to find the Defendant guilty of aggravated sexual battery beyond a reasonable doubt. The physician who examined the victim at the hospital found her to be consistent in her account that the Defendant had pulled her pants down and "tickled" her "private." The story she provided to the physician was also consistent with the story she told her mother and with the straightforward account she provided of the incident during her trial testimony. In contrast, the Defendant provided varying versions of the episode in his conversations with his co-workers, to Detective Evans during his interview, and during his trial testimony. By its verdict, the jury obviously accredited the testimony of the victim over that of the Defendant, as was its right. We, therefore, conclude that the evidence was more than sufficient to sustain the conviction for aggravated sexual battery.

Although it was not requested by the Defendant at trial or raised as an issue in his motion for new trial or on appeal, we note that the State failed to make an election of offenses, despite the fact that there was evidence of two separate incidents of the Defendant's touching of the victim's genital area -- in the living room when the victim was in her pajamas and again in his bedroom after the victim had dressed in shorts. The doctrine of election of offenses requires that when there is evidence at trial that a defendant has committed multiple offenses against a victim, the State must elect the facts upon which it is relying to establish each charged offense. State v. Johnson, 53 S.W.3d 628, 630 (Tenn. 2001) (citations omitted). Thus, when the State presents evidence showing that more than one offense occurred, but the indictment is not specific as to which offense the defendant is being tried for, it is the responsibility of the trial court to require the State to elect which offense is being submitted to the jury. State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999); see also State v. Brown, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991) ("[I]n cases involving evidence which shows a real potential that a conviction may occur as a result of different jurors concluding that the defendant

committed different acts, each of which separately showing the commission of an offense, the trial court must augment the general unanimity instruction to insure that the jury understands its duty to agree unanimously to a particular set of facts."). The defendant's right to a unanimous jury verdict on each and every count is "fundamental, immediately touching the constitutional rights of the accused." Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973).

Because the Defendant failed to include this issue in his motion for new trial or on appeal, we review only for plain error. See Tenn. R. App. P. 3(e); State v. Roland R. Smith, No. M2004-01457-CCA-R3-CD, 2005 WL 1541874, at *7 (Tenn. Crim. App. June 29, 2005) ("[T]he doctrine of election of offenses touches on a criminal defendant's fundamental constitutional rights and is therefore subject to plain error review, whether or not raised in a motion for new trial."), perm. app. denied (Tenn. Dec. 5, 2005)

The doctrine of plain error provides that where necessary to do substantial justice, an appellate court may take notice of a "plain error" not raised at trial if it affected a substantial right of the defendant. Tenn. R. App. P. 36(b). In order for us to find plain error, "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'" State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). A court's discretion to notice plain error is to be "sparingly exercised." State v. Bledsoe, 226 S.W.3d 349, 354 (Tenn. 2007). Consideration of all five factors is unnecessary when it is clear from the record that at least one of them cannot be satisfied. Id. at 355.

In our view, given the evidence at trial, the State should have been required to make a proper election of offenses and the trial court should have given a jury instruction on election of offenses. However, we find that no plain error occurred in light of the prosecutor's closing argument, which concentrated on the offense that occurred in the living room. This court has repeatedly held that a trial court's error in not instructing the jury on an election of offenses may be harmless "where the prosecutor provides during closing argument an effective substitute for the missing instruction." State v. Adrian Keith Washington, No. M2008-01870-CCA-R3-CD, 2010 WL 653008, at *6 (Tenn. Crim. App. Feb. 24, 2010) (internal quotations and citations omitted), perm. app. denied (Tenn. Aug. 26, 2010).

During both closing and rebuttal arguments, the prosecutor directed the jury's attention to the incident that occurred in the living room, reminding the jury in detail about the victim's testimony about the Defendant's having pulled down her pajama pants

and underwear and having touched her "private."  The prosecutor's only reference to the second incident was a brief comment, made after describing the first incident in detail, that the victim's nightmare ended but "a few minutes later the same nightmare played out in the bedroom where he again took down her pants, where he again took down her panties and where he again touched her private area."  During rebuttal argument, the prosecutor did not bring up the second incident but instead reminded the jury of the victim's testimony about the first incident in which the Defendant pulled down her pajama pants and underwear.  We, therefore, conclude that, in light of the State's closing argument, the lack of a formal election of offenses or jury instruction on election of offenses does not rise to the level of plain error.

## II.  Victim's Testimony

Intermingled with his argument on the sufficiency of the evidence, the Defendant contends that the trial court erred by not qualifying the child victim as a competent witness and by allowing the prosecutor to lead her testimony during direct examination.  The State notes that the Defendant did not raise any objection at trial and argues that this issue is therefore waived.  We, again, agree with the State.

As the State points out, the Defendant raised no objections to the victim's testimony at trial and, thus, has waived this issue for appellate review.  See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); Tenn. R. Evid. 103(a)(1) (requiring a timely objection as a prerequisite to a finding of error based on the trial court's admission of evidence).

Regardless of waiver, the Defendant would not be entitled to relief on the basis of this issue.  Rule 601 of the Tennessee Rules of Evidence provides that "[e]very person is presumed competent to be a witness except as otherwise provided in these rules or by statute."  Tenn. R. Evid. 601.  The list of persons who may be permitted to testify includes children.  See Tenn. R. Evid. 601, Advisory Comm'n Cmt.  Rule 603 provides that "[b]efore testifying, every witness shall be required to declare that the witness will testify truthfully by oath or affirmation, administered in a form calculated to awaken the witness's conscience and impress the witness's mind with the duty to do so."  Tenn. R. Evid. 603.  In addition, a trial court may permit leading questions of a child victim of a sexual offense on direct examination "when necessary to fully develop the witness's testimony."  State v. Jonathan Ray Swanner, No. E2010-00956-CCA-R3-CD, 2011 WL 5560637, at *6 (Tenn. Crim. App. Nov. 14, 2011) (citing Swafford v. State, 529 S.W.2d 748, 749 (Tenn. Crim. App. 1975)), perm. app. denied (Tenn. Mar. 7, 2012).  A witness's competency to testify and the use of leading questions on direct examination are left to

the trial court's discretion.  See State v. Nash, 294 S.W.3d 541, 548 (Tenn. 2009) (citation omitted); Tenn. R. Evid. 611(a), (c)(1) ("Leading questions should not be used on direct examination of a witness except as may be necessary to develop the witness's testimony.").

The victim was sworn before taking the stand and at the beginning of her testimony answered in the affirmative when asked if she knew "the difference between true and false."  She then recounted what had happened, with the prosecutor asking her some leading questions in an attempt to develop her testimony from her initial tendency to give one-word answers.  The prosecutor's use of leading questions was not excessive, and the questions were in no way suggestive of the answers.  We conclude, therefore, that the Defendant is not entitled to relief on the basis of this issue.

### III.  Defective Presentment

The Defendant contends that the presentment was constitutionally defective because "[c]ritical elements having to do with the *mens rea* for the crime of aggravated sexual battery were missing or misstated in the [p]resentment[.]"  The Defendant also points out that the language of the presentment, which charged him with "knowingly" engaging in sexual contact with the victim, does not track the language of the trial court's jury instruction, which correctly charged that for the jury to find him guilty of aggravated sexual battery, the State must have proven beyond a reasonable doubt that "the defendant had intentional unlawful sexual contact with the alleged victim in which the defendant intentionally touched the alleged victim's intimate parts . . . ."  The State argues that the presentment, by referencing the relevant statute, was sufficient to charge the Defendant with aggravated sexual battery and put him on notice of the required mens rea for the offense.  The State further argues that the Defendant has waived any claim that the trial court's jury instructions served as a constructive amendment to the presentment by not raising it as an issue in the motion for new trial.  We agree with the State.

An indictment or presentment must inform the accused of "the nature and cause of the accusation."  U.S. Const. amend. VI; Tenn. Const. art. I, § 9.  In addition, Tennessee Code Annotated section 40-13-202 requires that an indictment "must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment."

An indictment that achieves its "overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements."  State v. Hammonds, 30 S.W.3d 294, 300 (Tenn. 2000).  An indictment or presentment is

sufficient to satisfy notice requirements if it "contains allegations that (1) enable the accused to know the accusation to which answer is required; (2) furnish the trial court an adequate basis for entry of a proper judgment; and (3) protect the accused from a subsequent prosecution for the same offense." Id. at 299 (citing State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997)). "[A] defendant cannot legally be convicted of an offense which is not charged in the indictment or which is not a lesser offense embraced in the indictment." State v. Cleveland, 959 S.W.2d 548, 552 (Tenn. 1997) (citing State v. Trusty, 919 S.W.2d 305, 310 (Tenn. 1996)). Tennessee Rule of Criminal Procedure 12(b)(2)(B) provides that a motion alleging a defect in an indictment, presentment, or information must be raised before trial "but at any time while the case is pending, the court may hear a claim that the indictment, presentment, or information fails to show jurisdiction in the court or to charge an offense."

The presentment charged in pertinent part that the Defendant

on or about December 22, 2014, in the State and County aforesaid, and before the finding of this indictment, did unlawfully commit the offense of AGGRAVATED SEXUAL BATTERY by knowingly engaging in unlawful sexual contact with [the victim] . . ., a child less than thirteen (13) years of age; a Class B felony in violation of T.C.A. 39-13-504, and against the peace and dignity of the State of Tennessee.

The presentment clearly referenced the correct code section for the offense. Our supreme court has held that reference to the appropriate statute provides notice to the defendant of the applicable mens rea for the offense. See State v. Carter, 988 S.W.2d 145, 149 (Tenn. 1999). The Defendant was, therefore, put on notice of the offense for which he was being charged, including the applicable mens rea. Moreover, it was obvious from his defense at trial and his own testimony, in which he emphasized that any touching that might have occurred was not intentional, that he was well aware of the statutory elements of the crime.

Neither of the two cases the Defendant cites in support of his argument that the presentment was insufficient to charge him with the crime, State v. Schaller, 975 S.W.2d 313 (Tenn. Crim. App. 1997), and State v. Tymetric Lejuan Graham, No. E2006-02502-CCA-R3-CD, 2008 WL 565714, at *1 (Tenn. Crim. App. Mar. 4, 2008), are on point with the case at bar. In Schaller, this court concluded that an indictment was insufficient to charge the defendant with the aggravated sexual battery of a mentally deficient victim because, although it referenced the code section for aggravated sexual battery and charged that the defendant had unlawfully engaged in sexual contact with a person that the defendant knew or had reason to know was mentally deficient, it failed to charge that the defendant was aided and abetted by another person, an element required to elevate the

defendant's unlawful sexual contact with a mentally deficient person from sexual battery to aggravated sexual battery. Schaller, 975 S.W.2d at 316-17. In the case at bar, by contrast, the presentment not only referenced the appropriate statute but also specifically charged the Defendant with the specific element or accompanying circumstance on which the charge was based, *i.e.*, the victim's being less than thirteen years of age.

Graham can also be distinguished on its facts from the case at bar. In Graham, this court reversed the defendant's conviction for aggravated robbery and remanded for a conviction and sentence for attempted aggravated robbery because the indictment charged that the defendant *attempted* to take, rather than took, property from the person of another. In that case, we rejected the State's argument that the indictment's citation to the aggravated robbery statute was sufficient to put the defendant on notice of the charged offense, noting both that "an indictment for attempt normally cites the statute of the underlying offense," and that the cases cited by the State relied "on the statutory citation combined with the language in the body of the indictment." Graham, 2008 WL 565714, at *3.

The presentment here not only cited the aggravated sexual battery statute but also contained sufficient facts to provide the Defendant with notice of the subsection of the statute under which he was being charged. It also was sufficient to furnish the trial court with an adequate basis for entry of a proper judgment and to protect the Defendant from a subsequent prosecution for the same offense. Furthermore, we agree with the State that the Defendant has waived any argument that the trial court's jury instructions constituted an effective amendment to the indictment by not raising it as an issue in his motion for new trial. Accordingly, we conclude that the Defendant is not entitled to relief on the basis of this issue.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE